[Cite as *In re R.G.*, 2020-Ohio-3032.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE R.G. | : | |
| A Minor Child | : | No. 108537 |
| [Appeal by S.A., Mother] | : | |
| | : | |

## JOURNAL ENTRY AND OPINION

**JUDGMENT:**  REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:**  May 21, 2020

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD-17907988

---

### *Appearances:*

Gregory T. Stralka*, for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, Cheryl Rice and Willie Mitchell, Assistant Prosecuting Attorneys, *for appellee.*

ON RECONSIDERATION

PATRICIA ANN BLACKMON, P.J.:

{¶ 1} This court sua sponte reconsiders its decision in this case. After reconsideration, the opinion as announced by this court on February 6, 2020, *In re R.G.*, 8th Dist. Cuyahoga No. 108537, 2020-Ohio-381, is hereby vacated and substituted with this opinion. This opinion is the court's journalized decision in this appeal. *See* App.R. 22(C); *see also* S.Ct.Prac.R. 7.01.

{¶ 2} Appellant, S.A. (referred to herein as "Mother"), appeals from the order of the juvenile court that awarded permanent custody of her son, R.G., to the Cuyahoga County Department of Children and Family Services ("CCDCFS"). Mother assigns the following error for our review:

> The [CCDCFS] failed to present sufficient evidence to establish that [Mother] failed to substantially remedy the condition that caused the removal of the child.

{¶ 3} Having reviewed the record and the controlling case law, we reverse the decision of the trial court and remand for further proceedings.

{¶ 4} R.G. was born prematurely in 2016 and required a lengthy hospitalization in the NICU after his birth. On May 18, 2017, prior to R.G.'s discharge from the hospital, CCDCFS filed a complaint for emergency temporary custody. CCDCFS alleged that R.G. is neglected and dependent because of his premature birth, special medical needs, Mother's lack of consistency in visiting with him, and "inability to independently manage" his medical needs. CCDCFS further alleged that R.G.'s sibling is in the legal custody of a relative, and R.G.'s father has

not established paternity and is not in contact with R.G. R.G. was subsequently placed in the pre-adjudicatory temporary custody of CCDCFS on June 15, 2017.

{¶ 5} The adjudicatory hearing was held on August 23, 2017. Prior to the hearing, CCDCFS amended its complaint to delete the allegation of neglect, and Mother admitted the dependency allegations. R.G. was adjudicated a dependent child on September 21, 2017. Following a dispositional hearing, R.G. was committed to the temporary custody of CCDCFS on November 14, 2017.

{¶ 6} Mother's case plan required her to: (1) participate in a mental health assessment and follow recommendations; (2) consistently visit with R.G.; and (3) complete the required training for providing care for R.G. Father was required to establish paternity. The stated goal was reunification with Mother.

{¶ 7} On April 6, 2018, less than one year after the complaint was filed, CCFCDS filed a motion to modify temporary custody to permanent custody.[1] CCDCFS maintained that Mother failed to make significant progress on case plan objectives, i.e., made minimal efforts to complete mental health-related case plan services, failed to consistently visit with R.G., did not participate in training required to care for R.G. since August 2017, and did not attend many of his medical appointments. The trial court held a hearing on this motion on March 28, 2019. At the start of the hearing, CCDCFS informed the court that at the time of the filing of

---

[1] This date is also less than nine months after 60 days from removal from the home, less than eight months after R.G. was adjudicated a dependent child, and less than five months after R.G. was committed to the temporary custody of CCDCFS.

the motion for permanent custody, R.G. "was not in the custody of [CCDCFS] for 12 out of a 22-month consecutive period" and the basis of the motion was that R.G. "cannot be placed within a reasonable time or should not be placed" with the parents. Tr. 7.

{¶ 8} With regard to R.G.'s condition, social worker Cynthia Hurry ("Hurry") testified that R.G. was placed in therapeutic foster care in Ashland, Ohio, about an hour away from Mother. Hurry testified that this foster care was selected based upon availability of an appropriate placement at the time of R.G.'s discharge from the hospital. The placement required foster parents who were trained in CPR, use of the Pulse Oximeter Machine, the oxygen machine, feeding tube, and other care. They must also take him to a pulmonologist, a gastro specialist, a neurologist, and a therapist from the Help Me Grow Program.

{¶ 9} Foster parent Gary Gerwig ("Gerwig") testified that he and his wife, Celeste, have a therapeutic foster care license that permits them to care for medically fragile children, and they take ongoing training. For R.G. specifically, they completed two days of training at Rainbow Babies and Children's Hospital. They learned how to use his feeding machine, oxygen machine, Pulse Oximeter Machine, and generally care for him at their home. Gerwig also outlined for the court a typical day of their care for R.G., including feeding him via the feeding machine, giving him his medicine, and clearing his mucous using the pulmonary vest. According to this testimony, the concerted effort of both foster parents is required to complete the detailed care regimen, especially if R.G. is ill. R.G. is improving, but he is currently

at the developmental level of a one-year-old. Gerwig also testified that during her visits, Mother holds R.G. but does not participate in his care. However, he acknowledged that no feeding or pulmonary treatments were required during the course of her visits.

{¶ 10} Dr. Amy DiMarino ("Dr. DiMarino"), R.G.'s pediatric pulmonologist, testified that R.G. has chronic lung disease due to his premature birth. He is required to wear a pulmonary vest twice a day for 15 to 20 minutes in order to clear mucus from his lungs. R.G. also takes various medications by inhaler and nebulizer for coughing, wheezing, and asthma. Dr. DiMarino sees R.G. every two or three months to review his symptoms and medication. She stated that without proper care at home, R.G. would have to be hospitalized. However, Dr. DiMarino testified that R.G. is improving. He now has a normal breathing pattern and has been weaned off of some medication. Dr. DiMarino met Mother twice. To Dr. DiMarino, Mother did not seem engaged.

{¶ 11} With regard to Mother's compliance with the case plan requirement that she learn to care for R.G., Hurry established that prior to R.G.'s discharge from the hospital, Mother undertook some training to care for R.G. but did not learn all that is needed to care for him or to manage his medical appointments that are scheduled at various locations. Mother has attended only about ten of R.G.'s 60 appointments, but she did attend a feeding clinic to learn how to feed R.G. In another instance, Mother arrived for an appointment involving a medical procedure, but she was not permitted in because she had another child with her.

**{¶ 12}** As to the case plan requirement that Mother visit R.G., Hurry further testified that Mother's home is not appropriate for R.G.'s care. Mother visited R.G. at the foster home in June 2017, but she did not visit him again until June 2018. After obtaining a court order for Mother's transportation, Hurry arranged for a driver to take Mother to Ashland each Friday. Mother did not attend each week, but visited the child throughout June to September 2018, and several times in 2019. Mother also informed Hurry that she started a new job and was still a probationary employee, so she has difficulty attending visits and medical appointments.

**{¶ 13}** As to Mother's compliance with the case plan requirement that she undergo a mental health assessment, Hurry testified that in August 2017, Mother completed the assessment, but she did not return for additional services until May 2018.

**{¶ 14}** Mother testified that she has another child who lives with maternal grandmother, but she sees the child most days. Mother works as a nursing assistant and is preparing to take her certification examination. As part of her employment, she works with feeding machines and trachea equipment. She acknowledged that she has difficulties in visiting with R.G., but she explained that she is a probationary employee and does not have a driver's license.

**{¶ 15}** R.G.'s guardian ad litem ("GAL") testified that R.G.'s condition has improved due to the care of the foster parents and the doctors. The GAL did not believe that Mother would have been able to handle the required 24-hour care that R.G. needs, and he opined that permanent custody should be awarded to CCDCFS.

{¶ 16} On April 11, 2019, the trial court awarded permanent custody of R.G. to CCDCFS.[2]  The court concluded:

> The child is not orphaned, and has been in temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period.  * * *
>
> Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent(s) has failed continuously and repeatedly to substantially remedy the conditions causing the child to be - placed outside the child's home.  Paternity has not been established.  * * *
>
> The alleged father(s) has abandoned the child.  The parent(s) is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.
>
> The Court determines that the seriousness and nature of the child's special needs makes the child's placement with the child's parent a threat to the child's safety where the parent(s) have failed to remedy the conditions that caused the child to be placed outside the home.
>
> The Court finds that the child's continued residence in or return to the home of mother, will be contrary to the child's best interest.
>
> The Court further finds that reasonable efforts were made to prevent the removal of the child from her home, or to return the child to the home, and to finalize the permanency plan, to wit: reunification. Relevant services provided to the family and the reasons those services were not successful: case plan services included mental health services/counseling, transportation to and from visits due to out of county placement of the child, attendance at medical appointments and for medical training necessary for the care of the child, housing, supportive services and assistance for the child while in the parent's care.

---

[2] At this point, R.G. had been in CCDCFS's custody for less than two years.

That one or more of the factors in division (E) of section 2151.414 of the Revised Code exist and the child cannot be placed with one of the child's parents within a reasonable period of time or should not be placed with either parent; * * * the child has been in temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period; * * * the Court finds by clear and convincing evidence that a grant of permanent custody is in the best interests of the child and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.

## Sufficiency of the Evidence

{¶ 17} In the assigned error, Mother argues that there is insufficient evidence to show that she failed to substantially remedy the conditions that caused removal of R.G. She also argues that CCDCFS did not use reasonable case planning and diligent efforts to assist her in remedying the problems that caused placement outside her home.

{¶ 18} As an initial matter, we recognize that "[t]he purpose of the termination of parental rights statutes is to make a more stable life for the dependent children and to facilitate adoption to foster permanency for children." *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 67. However, a "parent's right to raise a child is an essential and basic civil right." *Id.*, quoting *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997). The termination of parental rights is "the family law equivalent of the death penalty in a criminal case." *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14. It is "an alternative [of] last resort." *In re Gill*, 8th Dist. Cuyahoga No. 79640, 2002-Ohio-3242, ¶ 21.

{¶ 19} R.C. 2151.414 sets forth a two-part analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. R.C. 2151.414(B). First, it authorizes the juvenile court to grant permanent custody of a child to the public agency if, after a hearing, the court determines, by clear and convincing evidence, that any of the following factors apply: (a) the child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned, and there are no relatives of the child who are able to take permanent custody; (d) the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period; or (e) the child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state. R.C. 2151.414(B)(1)(a)-(e). *In re J.G.*, 8th Dist. Cuyahoga No. 100681, 2014-Ohio-2652, ¶ 41. Only one of the factors must be present for the first prong of the permanent-custody analysis to be satisfied. *In re L.W.*, 8th Dist. Cuyahoga No. 104881, 2017-Ohio-657, ¶ 28.

{¶ 20} Second, when any one of the above factors exists, the trial court must analyze whether, by clear and convincing evidence, it is in the best interest of the children to grant permanent custody to the agency pursuant to R.C. 2151.414(D). *Id.*

{¶ 21} Clear and convincing evidence is that which will produce in the trier of fact "'a firm belief or conviction as to the facts sought to be established.'" *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

## A. Trial Court's Finding that Child Has Been In Temporary Custody for Twelve or More Months

{¶ 22} In this matter, the trial court found that:

The child is not orphaned, and has been in temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period.

{¶ 23} Here, Mother and CCDCFS both agree that following a dispositional hearing, R.G. was committed to the temporary custody of CCDCFS on November 14, 2017, and on April 6, 2018, i.e., less than five months later and less than 12 months after the filing of the initial complaint, CCFCDS filed a motion to modify temporary custody to permanent custody. Accordingly, insofar as the court's determination that R.G. "is not orphaned, and has been in temporary custody of a public children services agency * * * for twelve or more months of a consecutive twenty-two month period" was stated as a basis to establish the first prong for an award of permanent custody under R.C. 2151.414(B)(1)(d), the court erred.

{¶ 24} As explained in *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, "[b]efore a public children-services agency or private child-placing agency can move for permanent custody of a child on R.C. 2151.414(B)(1)(d) grounds, the child must have been in the temporary custody of an agency for at least 12 months of a consecutive 22-month period." *Id.* at paragraph one of syllabus. Moreover, as to the start of this period, "a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home." R.C. 2151.414(B); *In re Da.R.*, 3d Dist. Shelby No. 17-18-13, 2019-Ohio-2270, ¶ 11; *In re E.C.*, 4th Dist. Pickaway No. 19CA3, 2019-Ohio-2803. Further, "the time that passes between the filing of a motion for permanent custody and the permanent-custody hearing does not count toward the 12-month period set forth in R.C. 2151.414(B)(1)(d)." *In re C.W.* at ¶ 26. The "motion for permanent custody 'must allege grounds that currently exist.'" *Id.* at ¶ 24, quoting *In re K.G.*, 9th Dist. Wayne Nos. 03CA0066, 03CA0067, 03CA0068, 2004-Ohio-1421, ¶ 13.

{¶ 25} Therefore, the court erred insofar as it determined that CCDCFS met R.C. 2151.414(B)(1)(d) as a first prong of the requisite showing needed to establish permanent custody. Because R.G. was not in the temporary custody of an agency for at least 12 months of a consecutive 22-month period as of the date of the filing of the motion for permanent custody, there is no clear and convincing evidence supporting R.C. 2151.414(B)(1)(d) was established herein. However, we do

recognize that the court was permitted to note the overall length of time during which R.G. was in temporary custody, insofar as the court was simply outlining his custodial history. *See In re L.D.*, 2017-Ohio-1037, 86 N.E.3d 1012, ¶ 43 (8th Dist.).

{¶ 26} CCDCFS now insists that once there is a finding that the child has been in temporary custody for 12 of 22 months, the court does not consider the reunification factors under R.C. 2151.414(E) and instead only engages in the best interests analysis. In support of this argument in which the court may proceed to the best interests determination, CCDCFS cites to *In re C.W.* at ¶ 21; *In re D.A.*, 8th Dist. Cuyahoga No. 95188, 2010-Ohio-5618, ¶ 44. However, because the complaint for permanent custody was filed in this matter less than 12 months after the initial complaint and considerably less than 12 months after the dependency adjudication and commencement of CCDCFS's temporary custody, these cases are distinguishable from the instant matter.

### B. Trial Court's Finding that CCDCFS Made Reasonable Efforts at Reunification and Child Cannot Be Placed With Mother Within a Reasonable Period of Time

{¶ 27} In this case, the record shows that R.G. was not in the temporary custody of an agency for at least 12 months of a consecutive 22-month period. Additionally, the trial court concluded that R.G. "cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents."

{¶ 28} Under R.C. 2151.414(B)(1)(a), involving grounds that the child has not been in the temporary custody of an agency for at least 12 months of a

consecutive 22-month period and cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents, a trial court must consider the factors outlined in R.C. 2151.414(E*). In re A.V.*, 8th Dist. Cuyahoga No. 101391, 2014-Ohio-5348, ¶ 58; *In re R.*M., 8th Dist. Cuyahoga Nos. 98065 and 98066, 2012-Ohio-4290, ¶ 14; *In re B.P.*, 8th Dist. Cuyahoga Nos. 107732 and 107735, 2019-Ohio-2919, ¶ 13.

{¶ 29} Here, the trial court concluded that the following was met under R.C. 2151.414(E)(1):

> Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

{¶ 30} In this matter, we do not find that that clear and convincing evidence supports this finding. Turning to the question of whether the CCDCFS used reasonable planning and diligent efforts to assist Mother in remedying the problems causing placement of the child outside of the home, the record clearly demonstrated that Mother had difficulty in traveling to R.G. due to his placement in Ashland. However, the court did not inquire as to whether a suitable foster care option ever became available closer to Mother's home. While R.G.'s placement in Ashland may

still be reasonable given all of the presently available alternatives, there is nothing in the record to demonstrate that this is still the case.

{¶ 31} With regard to the next question of whether Mother failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home, the record plainly demonstrates that Mother was making progress in her case plan objectives. Significantly, she obtained employment as a nurse's assistant and worked with feeding tubes and trachea equipment in her employment.

{¶ 32} We recognize that R.G. has chronic lung disease related to his premature birth. Twice a day, he must wear a special vest in order to clear mucous from his lungs. He also requires inhalers and nebulized medications. Additionally, he must see a gastrointestinal specialist to address feeding issues, an immunology specialist, and an orthopedic specialist. He has a specialized feeder and a Pulse Oximeter Machine. We also recognize and acknowledge the high degree of excellent care that the Gerwigs are providing to R.G. in his therapeutic foster care. As his condition improves and he gets stronger, Mother is also improving her ability to care for him. Therefore, we conclude that Mother was simply not given enough of an opportunity for reunification.

{¶ 33} In this connection, this matter is distinguishable from this court's prior decision in *In re Awkal*, 95 Ohio App.3d 309, 642 N.E.2d 424 (8th Dist.), a case affirming the termination of parental rights and focused upon the child's need for a secure placement and the best interests of the child. However, unlike the

instant case, the parent in *In re Awkal* was imprisoned and did not dispute that the child could not or should not be placed with him; the case procedure and appeal focused upon the best interest analysis.

{¶ 34} As to the trial court's consideration of other factors under R.C. 2151.414(E), i.e., lack of commitment toward the child, and unwillingness to provide basic necessities, we conclude that the additional R.C. 2151.414(E) findings are likewise unsupported by sufficient evidence.

{¶ 35} Finally, we recognize that the placement of R.G. outside of the home occurred due to the tragic intersection of the peculiarities of the Ohio law and the child's unfortunate illness. That is, the child was not adjudicated to be neglected; he was deemed dependent due to his extremely challenging and life-threatening medical situation, a circumstance not of Mothers own creation. Ohio law defines a dependent child as any child:

> (C) Whose condition or environment is such as to warrant the State, in the interests of the child, in assuming the child's guardianship;
>
> (D) To whom both of the following apply:
>
> (1) The child is residing in a household in which a parent, guardian, or custodian or other member of the household committed an act that was the basis for an adjudication that a sibling of the child or any other child who resides in the household is an abused, neglected, or dependent child;
>
> (2) Because of the circumstances surrounding the abuse, neglect, or dependency of the sibling or other child and the other conditions in the household of the child, the child is in danger of being abused or neglected by that parent, guardian, or custodian or member of the household.

R.C. 2151.04.

{¶ 36} This definition appears to be unique. That is, the majority of states in this country tend to define dependency in terms of a parent's abuse, neglect, illness, addiction, or other condition that make the parent unable to discharge their parental responsibilities. *See, e.g.*, Cal.Welf. & Inst.Code Section 300; Florida Stat.Ann. 39.01(15). Generally, dependency must be shown in relation to "evidence of conduct" that "places the health, safety or welfare of the child at risk." *See, e.g.*, 23 Pa.C.S. 6302.

{¶ 37} Ohio's less stringent dependency definition places it within the small group of states that define dependency beyond the risks of harm from a parent's abuse, neglect, illness, addiction, or other conditions that make the parent unable to discharge their parental responsibilities. In this group, dependency can result absent parental fault. *Accord* Maine 22 R.S.A. 4055(1)(B)(2)(b)(i)-(ii) (the parent is unwilling or unable to protect the child from jeopardy, and parent has been unwilling or unable to take responsibility for the child); Wis. Stat. 48.424(4) (no intent to harm or neglect is needed, or parent fails to assume significant responsibility for the daily care of the child); N.C. Gen. Stat. 7B-101(9) (the parent is unable to provide for the care or supervision and lacks an appropriate alternative child care arrangement).

{¶ 38} Ohio dependency determinations for medically fragile children present especially difficult questions. Often the medical problems are unexpected, at which point the parent is neither emotionally nor medically prepared to address these challenges and to understand and comply with case plan requirements.

Typically, as in this matter, the parent has job obligations and other family needing his or her care. Once under county control, the parent has limited time to both learn to cope with the situation and become able to provide the requisite medical care and support. Time is of the essence to avoid the loss of parental rights, yet extreme stressors remain.

{¶ 39} In conclusion, following our review of the record and the controlling caselaw, we find that there is insufficient evidence to support the first prong of the required showing for termination of parental rights.

{¶ 40} The assigned error is well-taken.

{¶ 41} The judgment of the trial court is reversed and the matter is remanded for further proceedings consistent with this opinion.

It is ordered that appellant recover from appellee the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the court of common pleas, juvenile division, to carry this judgment into execution.

A certified copy of this journal entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
PATRICIA ANN BLACKMON, PRESIDING JUDGE

RAYMOND C. HEADEN, J., CONCURS;
KATHLEEN ANN KEOUGH, J., DISSENTS
WITH ATTACHED OPINION

KATHLEEN ANN KEOUGH, J., DISSENTING:

{¶ 42} Respectfully, I dissent. The majority concludes there was not clear and convincing evidence to support the trial court's finding that R.G. could not or should not be placed with Mother in a reasonable time because CCDCFS did not make reasonable efforts toward reunification, and Mother was not given a sufficient opportunity to remedy the conditions that led to R.G.'s removal from her home. I disagree.

{¶ 43} As the majority points out, Mother had difficulty visiting R.G. due to his placement in Ashland. But the record reflects that this placement was necessary because R.G. needed to be placed with medically qualified foster parents who were able to care for his extensive medical needs. Social worker Hurry testified that in June 2018, the agency made arrangements with a cab service to provide door-to-door transportation for Mother to and from the foster home every Friday afternoon, but although Mother visited a few times in June and July, the visits "immediately started tapering off." Hurry testified that since Mother's last visit in September 2018, she had visited R.G. only once in January 2019 and once in February 2019. Mother acknowledged on cross-examination that even after the agency began providing transportation for her to and from the foster home, she missed more than half of her scheduled visits with R.G. It is difficult to conclude on this evidence that CCDCFS did not make reasonable efforts to assist Mother with reunification. Instead, the evidence demonstrates that Mother did not avail herself of the opportunities provided to her.

**{¶ 44}** The majority also concludes that "Mother was making progress in her case plan objectives" and "improving her ability to care for [R.G.]" such that the trial court's finding that Mother failed to substantially remedy the conditions that led to R.G. being placed outside her home was not supported by clear and convincing evidence. Again, I disagree.

**{¶ 45}** The record demonstrates that as of April 3, 2019, the date of the permanent custody hearing, Mother was not making any progress with her mental health treatment recommendations, one of her case plan objectives. Hurry testified that Mother had a mental health evaluation in August 2017, and was referred for additional services, but did not return to the mental health agency until May 2018. She was again seen there in September 2018, and November 2018, but never returned after that for any mental health services.

**{¶ 46}** With respect to completing the required training regarding the various medical devices used by R.G., another case plan objective, Mother testified that she learned how to use a feeding tube in her job as a nurse assistant. She acknowledged, however, that she had no experience with the vest that R.G. wears every day, and admitted that she had not met many of R.G.'s doctors. Indeed, the record reflects that although the foster parents took R.G. to at least 60 doctor's visits after June 2017, and Mother was advised by CCDCFS of all the appointments, Mother went to only six appointments in 2017, two in 2018, and one in 2019. The evidence further reflects that Mother did not ask any questions of the doctors during the visits, nor did she ever give Hurry any reasons regarding why she missed the

medical appointments. In light of this evidence, I fail to see how Mother was making any progress on her case plan objectives.

{¶ 47} The majority notes that R.G.'s condition has improved during his nearly two-year stay with the foster parents, and concludes that given more time, Mother could adequately care for him. But R.G.'s medical condition improved precisely because he received the medically prescribed care from his foster parents, who went to all his doctor's appointments and obtained training on all of the medical devices used to treat him.

{¶ 48} And Mother's minimal progress in learning to use a feeding tube is not sufficient to demonstrate that given more time, she could adequately care for R.G.'s extensive medical needs when he is healthy, much less when he is sick. As described by Gerwig, R.G.'s foster father, a typical day with R.G. requires constant attention to R.G.'s needs. Gerwig said that R.G. wakes up around 8:00 a.m. and if he is healthy, "he has two puffs of Ventolin with a spacer, then ten minutes in the vest, then two puffs of the Dulera, and we count to make sure it's a least ten breaths on each side." Gerwig said that after that is completed, he and his wife mix the formula for R.G. and feed him through his feeding tube, which takes approximately 30 minutes. They then give him two more medications and water through a bolus syringe. At 10 a.m., they given him more water. At noon, they feed him again, and then put him down for a nap. At around 4:30 p.m., they again treat him with the vest, and then feed him and give him more medicine, a process that takes at least an hour. Gerwig said that after the evening feeding, they give R.G. more medications

and then water. At around 7:30 p.m., they get R.G. ready for bed, which includes placing him in a hip-abductor brace to correct his hip placement. Gerwig said that when R.G. is sick, he and his wife do breathing treatments every two to three hours during the day and a few times at night. Gerwig said that it would be hard to keep up with him" if he had to take care of R.G. by himself because even when R.G. is healthy, "it's a full-time job with R.G." In light of this testimony, it is difficult to conclude that Mother's minimal training and familiarity with R.G.'s extensive medical needs would allow her to adequately care for R.G. in a manner that would sustain his improved medical condition or foster continued improvement in his condition.

{¶ 49} On this record, I would affirm the trial court's judgment finding that CCDCFS made reasonable efforts for reunification, but Mother failed to remedy the conditions that led to R.G.'s removal from her home, R.G. could not or should not be placed with Mother within a reasonable time, and permanent custody was in R.G.'s best interest.