[Cite as *In re K.F.*, 2023-Ohio-1286.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE K.F., ET AL.                          :

                                         :          No. 112086

Minor Children                              :

                                         :

[Appeal by K.G., Mother]                    :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 20, 2023

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD-19914703 and AD-19914704

---

### *Appearances:*

Valore & Gordillo LLP and Matthew O. Williams, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee* CCDCFS.

MARY EILEEN KILBANE, J.:

{¶ 1} Appellant K.G. ("Mother") appeals from the juvenile court's decision awarding permanent custody of her minor children K.F. (d.o.b. 11/13/2014) and T.F. (d.o.b. 11/2/2016) (collectively "the children") to the Cuyahoga County Division of

Children and Family Services ("CCDCFS" or "the agency"). For the following reasons, we affirm.

**Factual and Procedural History**

{¶ 2} On December 9, 2019, the agency filed a complaint for abuse, neglect, dependency and temporary custody to the agency with respect to mother's three children, K.F., T.F., and K.T. (d.o.b. 1/16/19). K.F. and T.F. share a biological father, Tr.F. Tr.F. failed to establish paternity of the children, had previously engaged in domestic violence with Mother, and did not participate in the underlying proceedings; as such, Tr.F. is not relevant to this appeal. K.T.'s father, S.T., was in a relationship with Mother for the duration of the underlying case and actively participated in the case with respect to K.T. The instant appeal involves only K.F. and T.F.; a separate appeal was filed by S.T. regarding the custody of his child, K.T.[1] Thus, we will address the facts of the case as they relate to K.F. and T.F.

{¶ 3} The complaint alleged that on or about December 5, 2019, all three children were observed with multiple injuries. K.F. had injuries on his ear, chest, and back. T.F. had a black eye and injuries to his forehead, stomach, arm, and back. Medical professionals determined that the injuries to K.F. and T.F. were from being hit with a cord; police intervention was required, and a criminal investigation was pending. The complaint went on to allege that Mother had an anger management

---

[1] K.T. is not a subject of this appeal. The juvenile court granted K.T.'s father's motion for legal custody. CCDCFS appealed that decision in *In re K.T.*, 8th Dist. Cuyahoga No. 111996.

problem for which she was not currently in treatment and regularly hit the children with cords and threw things at them.

**{¶ 4}** The complaint further alleged that Mother failed to provide for the children's basic needs, specifying that the children lacked clean clothing and smelled of urine. The complaint further alleged that Mother had depression, posttraumatic stress disorder, and anxiety, for which she was not currently in treatment, which prevented her from providing a safe home for the children.

**{¶ 5}** The magistrate granted the agency's motion for predispositional temporary custody and ordered Mother to have no contact with the children. The children were first placed in a temporary placement and eventually placed with Mother's godmother, ("Godmother"), and her husband (collectively, "the foster parents"), in February 2020. The children remained with the foster parents for the duration of these proceedings.

**{¶ 6}** In October 2020, CCDCFS filed an amended complaint, alleging that Mother had been criminally charged with multiple counts of felony and misdemeanor endangering children and misdemeanor domestic violence related to all three children's injuries. In December 2020, the court found the children abused, neglected, and dependent. At that time, the court lifted Mother's no-contact order.

**{¶ 7}** The court granted two extensions of temporary custody. In January 2021, CCDCFS moved for its first extension of temporary custody, asserting that Mother and S.T. needed additional time to complete the case plan and that Mother needed more time to rebuild her relationship with the children. The court granted

this motion. In May 2021, CCDCFS moved for a second extension of temporary custody. The agency's motion acknowledged Mother's progress but asserted that because all of the case plan objectives had not yet been completed, "the risk to the children [had] not been sufficiently reduced."

{¶ 8} On November 9, 2021, CCDCFS filed a motion to modify temporary custody to permanent custody with an affidavit from agency social worker April Palidar ("Palidar") in support of the motion. Palidar's affidavit averred that Mother had been convicted in her criminal case on three counts of child endangering and one count of domestic violence, with all three children as victims.[2] Palidar further averred that Mother was unsuccessfully discharged from probation in that case, that the children continued to express fear of their mother, that Mother had been inconsistent in mental health services and had failed to benefit from family counseling with the children, and that Mother and S.T. continued to "engage in an unstable and volatile relationship which impacts their ability to provide for the basic and emotional needs of the children."

{¶ 9} On February 28, 2022, S.T. filed a motion for legal custody of K.T.

{¶ 10} The children's guardian ad litem ("GAL") submitted reports on February 18, 2020 (recommending temporary custody to the agency), January 26 2021 (recommending a first extension of temporary custody), February 25, 2021,

---

[2] In Mother's criminal case, she pled guilty to three counts of endangering children, a misdemeanor, in violation of R.C. 2919.22(B)(1), with all three children as victims, and one count of domestic violence, a misdemeanor, in violation of R.C. 2919.25, with K.F. as a victim.

and June 30, 2022. In her final report, the GAL noted that K.F. was actively engaged in trauma therapy, but has continued to talk about the things Mother did to him and his nightmares, and he reported being nervous that something bad would happen to him if he returned to his Mother. The GAL noted that while the children had made some progress in their time away from Mother, they began to regress when visitation with Mother resumed. The GAL ultimately recommended that it was in the children's best interests for the agency's motion to modify temporary custody to permanent custody be granted. Specifically, the GAL stated:

> The children have been removed from their Mother's custody for over 2 years. The children were adjudicated abused and dependent. The children K.F. and [T.F.] received non-accidental injuries caused by their Mother. Mother had a restraining order and had not visited the children for about a year. Visitation has been detrimental for the children and no progress [has been] reached with family counseling. The children K.F. and [T.F.] continue working with mental health providers for their trauma. CCDCFS has concerns regarding Mother's mental health. Social worker reported [Mother's] housing is not appropriate. Mother and [S.T.'s] relationship is unstable. [S.T.] indicated on 5/17/2022 that he is looking for a suitable house for the family. He indicated that he is in a relationship with the children's mother and both wish reunification with the three children. Social worker reported concerns regarding [S.T.'s] anxiety [and] past domestic violence with the children's Mother. The children have been placed with a kinship placement with fictive kin. The children's basic needs are met at placement. The children have a strong bond with caregiver.

{¶ 11} On July 1, 2022, the court held a trial on the agency's motion for permanent custody and S.T.'s motion for legal custody of K.T. Godmother testified that she was Mother's godmother, having grown up with Mother's mother. Godmother testified that the children were placed with her in February 2020.

Godmother testified that when the children were first placed with her and her husband, they were underweight. Godmother testified in detail about the various trauma responses the children exhibited. She testified that the children were very loving and liked to laugh, but they also did not like to be touched, would jump if someone spoke loudly, ate off the floor, and had other behavioral issues. Godmother testified that K.F. and T.F. had regular nightmares.

{¶ 12} With respect to K.F., Godmother testified that he pulled his hair out several times and regularly had bathroom accidents when he was nervous or anxious. Godmother testified that this behavior often coincided with seeing his Mother.

{¶ 13} With respect to T.F., Godmother testified that he would purposely misbehave on days that visits with Mother were scheduled, saying, "[H]e has been purposely misbehaving on visit day so that I would maybe ground him and he would say, well, I will stay home and you don't have to — you know, you can ground me. I will stay home." Godmother also testified that T.F. had a lot of anger and gets anxious; he sometimes makes himself throw up when he is upset.

{¶ 14} Godmother testified that she had a relationship with Mother, but it primarily centered around communications regarding visitation and other matters related to the children. Godmother testified that she and her husband would intend to adopt the children if they were allowed. She further testified that she had spoken to S.T. about the possibility of remaining involved in the children's lives if

permanent custody were to be granted, saying that it would be possible with the help of a therapist and after the children had healed from their trauma.

{¶ 15} When asked if the children had ever said anything to her about what their lives were like with Mother, Godmother stated:

So they started to tell us stories here and there, and then when [Kelsey Cirkvencic, the children's licensed professional counselor] was involved, [K.F.] started to tell more stories.

And so she has heard these stories as well, and [K.F.'s] been very consistent with the details and he's talked about one time he pooped in his pants and got in trouble and said that [Mother] was going to call the police on him and was gonna leave him by the side of the road because he wasn't allowed to do that.

And still that's fixated in his head. Kelsey did mention once that she thinks that's why some of the bathroom issues are going on with him, because he talks about it a lot. He's very, very focused on it.

He said that [T.F.] used to crawl out of the window all the time and that they were left alone in the house a lot, and that also he said that he ate chicken nuggets one time that were [T.F.'s] and so he had to sleep on the porch for a while at night, locked out on the porch, and he gets hysterical about shutting the door on him.

He leaves the bathroom door open. He doesn't like to shut it all the time. He's starting to close it a little now, but he's just like very scared about shutting doors and things and he said he couldn't get in and it scared him, and [T.F.] talks about being locked in this kitchen once.

I don't know details on that because he's not very forthcoming, and again, you know, he was really little and so I'm not sure about that.

{¶ 16} The children's licensed professional counselor, Kelsey Cirkvencic ("Cirkvencic"), testified that she had worked with K.F. beginning in May 2020 and T.F. beginning in May 2021. Cirkvencic testified that the agency referred the children to her due to physical abuse. Cirkvencic testified that she had diagnosed

K.F. and T.F. with posttraumatic stress disorder related to physical abuse and trauma by Mother. Cirkvencic went on to testify that at one point, she had attempted to integrate Mother into her therapy with the children, and Mother often seemed disengaged. Cirkvencic's testimony generally corroborated Godmother's testimony related to the children's trauma-related behavioral issues.

{¶ 17} Palidar testified that she was the agency social worker assigned to this case in December 2020. Palidar testified as to Mother's criminal case stemming from her physical abuse of the children and resulting convictions for child endangering related to all three children. Palidar also testified that she had discussed the case with Mother and learned that Mother had been unsuccessfully discharged from her probation after testing positive for drugs.

{¶ 18} Palidar testified that Tr.F. had very sporadic involvement in the case and had not consistently participated in visitation with the children or with the case overall, and he had a 2018 domestic violence criminal case in a different jurisdiction in which Mother was the victim. Palidar also testified that the children had reported that Mother's abuse was ongoing, but at some point during the pendency of the case, Mother and S.T. were approved for unsupervised visitation. Palidar testified that unsupervised visits could not happen at Mother and S.T.'s home because the agency had safety and sanitation concerns; the visits happened in community environments, such as parks and libraries. Palidar testified that as of the date of trial, she would not recommend giving Mother unsupervised in-home visitation. Further, she testified that she still had concerns about Mother's ability to parent the

children, stating that although Mother had completed a parenting program, the children continued to express that they were fearful of Mother and T.F.'s anxiety in particular continued to worsen related to Mother. Palidar ultimately testified that she believed it was in the children's best interests to remain with the foster parents permanently.

{¶ 19} S.T. testified on his own behalf in support of his motion for legal custody of K.T. Finally, the GAL testified as to her recommendation that all three children should be placed in the agency's permanent custody. The GAL reiterated that the children had been removed from their Mother for over two years, K.F. and T.F. had intentional physical injuries caused by their Mother while she was living with S.T., and even when Mother was able to participate in visitation with the children, visitation was ultimately detrimental to the children due to the trauma. The GAL testified that Mother was engaged in various case plan services and was compliant with parenting classes and the agency had given Mother an opportunity to try to rebuild her bond and trust with the children, but that did not happen.

{¶ 20} On September 29, 2022, the juvenile court granted the agency's motion for permanent custody of K.F. and T.F. and granted S.T.'s motion for legal custody of K.T. In corresponding journal entries, the court made the following findings with respect to K.F. and T.F.:

> The Court finds by clear and convincing evidence that pursuant to O.R.C. [sic] 2151.414(B)(1):

(d) the child has been in temporary custody of a public children services agency or private child placing agency for twelve or more months of a consecutive twenty-two month period.

The Court finds that the child's continued residence in or return to the home of [Mother] or [Tr.F.] would be contrary to the child's best interest.

The Court further finds that reasonable efforts were made to prevent the removal of the child from the home, or to return the child to the home and finalize a permanency plan, to wit: reunification. Relevant services provided to the family include: Mental Health counseling, substance abuse counseling, and parenting courses.

The court went on to cite statutory factors R.C. 2151.414(D)(1)(a) through (e) before going on to find, by clear and convincing evidence, that a grant of permanent custody was in the best interests of the children.

{¶ 21} Mother appeals, presenting two assignments of error for our review:

I. The trial court's award of permanent custody and termination of the appellant's parental rights is against the manifest weight of the evidence.

II. The trial court erred when it allowed hearsay testimony concerning statements about abuse allegedly made by appellant's minor children.

**Law and Analysis**

**I. Manifest Weight**

{¶ 22} Mother's first assignment of error argues that the trial court's award of permanent custody to the agency and the termination of her parental rights was against the manifest weight of the evidence. Specifically, Mother argues that the court's termination of her parental rights was against the manifest weight of the evidence because the alleged abuse was poorly described in the record, there was little evidence to suggest that the children's emotional and behavioral problems had

improved while in agency custody, and the agency's allegations that Mother was not benefiting from case plan services were unsupported by the record.

{¶ 23} A parent has a fundamental interest in the care and custody of his children. *In re L.W.*, 8th Dist. Cuyahoga No. 107708, 2019-Ohio-1343, ¶ 20. However, parental rights are not absolute: "'The natural rights of a parent are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, 86 N.E.3d 1012, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979). "By terminating parental rights, the goal is to create 'a more stable life' for dependent children and to 'facilitate adoption to foster permanency for children.'" *In re R.G.*, 8th Dist. Cuyahoga No. 104434, 2016-Ohio-7897, ¶ 21, quoting *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 67, citing *In re Howard*, 5th Dist. Tuscarawas No. 85 A10-077, 1986 Ohio App. LEXIS 7860, 5 (Aug. 1, 1986).

{¶ 24} On a motion for permanent custody, a juvenile court must satisfy the two-prong test set forth in R.C. 2151.414 before it can terminate parental rights and grant permanent custody to the agency. The juvenile court must find by clear and convincing evidence that any one of the conditions set forth in R.C. 2151.414(B)(1)(a) through (e) apply and that it is in the best interest of the child to grant permanent custody to the agency. *In re R.G.*, 8th Dist. Cuyahoga No. 108537, 2020-Ohio-3032, ¶ 19-20.

{¶ 25} Clear and convincing evidence has been defined as "'that measure or degree of proof which is more than a mere "preponderance of the evidence," but not

to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 26} The juvenile court must find by clear and convincing evidence that one of the following five conditions applies under R.C. 2151.414(B)(1):

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children service agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

> (b) The child is abandoned.

> (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

> (e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated

an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

R.C. 2151.414(B)(1).

{¶ 27} Here, Mother does not dispute that the court satisfied the first prong by finding, pursuant to R.C. 2151.414(B)(1)(d), that the children were in the temporary custody of CCDCFS for "twelve or more months of a consecutive twenty-two month period." At the time of trial, the children had been in agency custody for over two years. Instead, Mother challenges the second prong, which requires a juvenile court to find that permanent custody is in the best interest of the child.

{¶ 28} R.C. 2151.414(D) provides a list of factors for the court to consider in determining the best interest of the child. Here, the court considered the factors in R.C. 2151.414(D)(1)(a) through (e):

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

Specifically, the court's journal entry referred to the children's ongoing trauma related to Mother and the fact that they were "frightened and hesitant to being in her company." The court also referred to the wishes of K.F. and T.F., stating that they "voiced their concerns to their [social] worker and advised her that they do not want to be around Mother" and moreover, refused to participate in family counseling with Mother. The court also referred to the children's custodial history and secure placement with the foster parents.

{¶ 29} This, together with the ample evidence in the record of Mother's abuse of the children, shows that clear and convincing evidence supported the trial court's decision to grant the agency's motion for permanent custody. Mother's arguments lack merit.

{¶ 30} While Mother argues that the alleged abuse is "extremely poorly described" in the record, our review of the record reveals an extensive depiction of Mother's ongoing abuse of the children. Each witness testified, in varying degrees, as to the nature of the abuse and its ongoing impact on the children. While the children did not testify at trial, their wishes were communicated clearly through the GAL's testimony and multiple reports. Moreover, the record reflects that Mother pleaded guilty to endangering children in a separate criminal case that resulted from her abuse of the children. Mother's assertions in her briefs are entirely at odds with the overwhelming majority of the evidence in the record.

{¶ 31} Mother also attempts to misconstrue her children's trauma responses as evidence that, contrary to the agency workers' testimony, the children were not "improving" in their placement with Godmother. This is an extreme distortion of the testimony and evidence in the record. Godmother, the children's licensed professional counselor, the agency social worker, and the GAL all testified as to how the children's behavioral issues were a direct result of their abuse at the hands of Mother. Specifically, testimony was elicited that certain behavior correlated with the children resuming contact with Mother, in the form of visitation, following the termination of the no-contact order in place for the first year of this case. The children's emotional and behavioral issues that Mother attempts to use as evidence that they are not thriving in agency custody were a product of their ongoing fear of Mother. Finally, with respect to whether Mother has benefited from case plan services, the record reflects that Mother had successfully engaged in numerous case plan services. The record also reflects, however, that Mother was inconsistent with mental health treatment and pled guilty to endangering the children. Furthermore, even if Mother had met all of her case plan goals to the satisfaction of the agency and the court, it is well established that

> [a] parent can successfully complete the terms of a case plan yet not substantially remedy the conditions that caused the children to be removed — the case plan is simply a means to a goal, but not the goal itself. Hence, the courts have held that the successful completion of case plan requirements does not preclude a grant of permanent custody to a social services agency.

*In re S.P.*, 8th Dist. Cuyahoga No. 111081, 2022-Ohio-2277, ¶ 38 (internal citations omitted).  Here, Mother's substantial compliance with the case plan clearly failed to remedy the conditions that caused the children to be removed.  Therefore, the trial court's grant of permanent custody to the agency was not against the manifest weight of the evidence.  Mother's first assignment of error is overruled.

## II. Hearsay

{¶ 32} In her second assignment of error, Mother argues that the trial court erred when it allowed hearsay testimony concerning statements about abuse allegedly made by the children.  Specifically, Mother challenges testimony from Godmother and Cirkvencic, over objection, regarding "stories" told by the children about their alleged abuse at Mother's hands.

{¶ 33} The rules of evidence apply to dispositional proceedings pursuant to R.C. 2151.353(I).  Nevertheless, a trial court has broad discretion in admitting or excluding evidence, and absent an abuse of discretion and a showing of material prejudice, a trial court's ruling on the admissibility of evidence will be upheld.  *In re C.J.*, 8th Dist. Cuyahoga Nos. 100532 and 100534, 2014-Ohio-2403, ¶ 37, citing *In re J.T.*, 8th Dist. Cuyahoga Nos. 93240 and 93241, 2009-Ohio-6224, ¶ 67, citing *State v. Martin*, 19 Ohio St.3d 122, 129, 483 N.E.2d 1157 (1985).  Further, the juvenile court is presumed to be able to disregard improper testimony.  *Id.* at ¶ 38. Therefore, the admission of hearsay testimony in parental rights cases, even if error, is not considered prejudicial unless it is shown that the judge relied on improper

evidence in making their decision. *Id.*, citing *In re J.T.*, citing *In re Lucas*, 29 Ohio App.3d 165, 504 N.E.2d 472 (3d Dist.1985).

{¶ 34} As an initial matter, we note that much of the testimony Mother appears to be challenging was offered to provide an explanation for the children's ongoing behavioral and emotional issues, and not to prove that the children were abused. Even if Mother is correct in her assertion that the testimony of Godmother and Cirkvencic constituted inadmissible hearsay, she has failed to establish, or even argue, that the trial court relied on this testimony in making its decision. This is especially so where evidence of the children's trauma-related behavioral issues appeared throughout the record, and not just in the testimony from these two witnesses, and evidence of the abuse the children suffered also appeared throughout the record, including in the form of evidence regarding Mother's convictions for endangering children. For these reasons, we cannot conclude that the trial court abused its discretion in admitting testimony from Godmother and Cirkvencic as to the children's accounts of their abuse. Therefore, Mother's second assignment of error is overruled.

{¶ 35} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27

of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, JUDGE

KATHLEEN ANN KEOUGH, P.J., and
LISA B. FORBES, J., CONCUR