[Cite as *In re I.L.*, 2023-Ohio-1674.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE I.L.                                          :

Minor Child                                         :            No. 112240

[Appeal by T.L., Mother]                            :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 18, 2023

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD-18-910881

---

### *Appearances:*

Stephanie Anderson, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee CCDCFS.*

MARY E. KILBANE, J.:

{¶ 1}   Appellant-mother, T.L. ("Mother"), appeals the juvenile court's decision terminating her parental rights and granting permanent custody of her child, I.L. (d.o.b. 02/16/2007), to the Cuyahoga County Division of Children and Family Services ("agency").

**{¶ 2}** For the following reasons, we affirm the juvenile court's decision.

## Factual and Procedural History

**{¶ 3}** On September 4, 2018, the agency filed a complaint in juvenile court in Cuyahoga J.C. No. AD-18-910881 for abuse, neglect, and temporary custody of I.L. and a motion for predispositional temporary custody of I.L.[1] The complaint alleged in relevant part:

> 1. There is a significant parent-child conflict in the home between mother and I.L. On or about September 3, 2018, Mother and I.L. engaged in a physical altercation. The Maple Heights Police were called to [M]other's home and the child was transported to the hospital where child was treated for her injuries. A police investigation is ongoing, and [M]other will be charged with domestic violence and child endangerment. A.L. [I.L.'s younger sibling,] was in the home during the altercation between [M]other and I.L.

> 2. I.L. has significant mental health and behavioral issues which [M]other has not adequately addressed. Mother has engaged child in services in the past, however, child has not been engaged in services for at least the past year.

> * * *

> 5. Father of I.L., [An.L.], has failed to support, visit, or communicate with the child on a consistent basis.[2]

**{¶ 4}** On the same date, the magistrate held a hearing on the complaint. Mother denied the allegations in the complaint and stipulated to a finding of probable cause to the motion for predispositional temporary custody. The

---

[1] On the same date, the agency also filed a complaint in Cuyahoga J.C. No. AD-18-910882 for abuse, neglect, and protective supervision of A.L., the sibling of I.L. A.L. is not the subject of this appeal and we will not address the portions of the case that reference A.L.

[2] Father is not a party to this appeal.

magistrate granted the agency's motion for predispositional temporary custody; found probable cause to remove I.L. from the home of Mother; and committed I.L. to the emergency temporary care and custody of the agency. On September 5, 2018, the magistrate appointed Christina Joliat as guardian ad litem ("GAL") for I.L. On October 5, 2018, the agency placed I.L. in the care and custody of her paternal cousin, C.C.

{¶ 5} On October 29, 2018, the agency filed a case plan that identified the need for Mother to complete family and individual counseling and learn effective parenting skills, and for I.L. to complete family and individual counseling. On November 21, 2018, the magistrate adjudicated I.L. neglected and abused and committed I.L. to the temporary custody of the agency.

{¶ 6} As of February 2019, Mother had visited I.L. only three times since the child was placed in custody, and Mother had made no progress on her case plan. Mother claimed she spoke with I.L. daily and was willing to participate in services to regain custody of her daughter.

{¶ 7} On August 16, 2019, Mother completed a mental health and chemical dependence assessment that recommended individual counseling. Around the same time, C.C. reported to the agency her unwillingness to assume long-term responsibilities for the child because of I.L.'s challenging behavior.

{¶ 8} On September 25, 2019, the agency filed an updated case plan that stated Mother did not consistently engage with the agency and refused to participate in supervised visits with I.L.

{¶ 9} On September 27, 2019, the trial court conducted a hearing on the agency's motions for extension of temporary custody and request for specific findings. Mother participated and voiced her agreement with both motions. The agency's ongoing social worker testified that Mother's case plan required Mother to obtain mental health services and family counseling; obtain stable housing; and maintain employment. The agency social worker testified that in the past month, Mother had engaged in parenting and anger management classes and maintained employment. The testimony demonstrated that Mother was currently living with I.L.'s maternal grandmother. The social worker also testified that I.L. was enrolled at Signature Health and was placed with C.C. The GAL testified that in the preceding month, Mother and I.L. had visited regularly. On October 15, 2019, the trial court granted the agency's motion for extension thereby extending temporary custody until March 2, 2020.

{¶ 10} According to the agency's February 12, 2020 semiannual review report ("SAR Report"), I.L. was diagnosed with unspecified episodic mood disorder, unspecified psychosis, and adjustment disorder with mixed disturbance of emotions and primary conduct. At that time, I.L.'s behavior had improved with an adjustment of her medications. The report indicated that Mother and I.L. attended only one session of family counseling in November 2019, and the parties' progress on their case plan was inconsistent. The report stated that the agency observed progress in I.L.'s behavior, but Mother did not observe any improvements. The report reflected that Mother still lived with I.L.'s maternal grandmother, and I.L. was not welcome

in that home due to I.L.'s alleged inappropriate and disrespectful behavior towards Mother and maternal grandmother. The report further stated that Mother provided the case worker with inconsistent statements that Mother wanted to regain custody of I.L. and that I.L. should remain in C.C.'s custody.

{¶ 11} As of February 18, 2020, the GAL stated in her report that Mother and I.L. were engaged in a "high conflict" relationship that was unresolved even with agency services. The GAL further stated that Mother was not yet ready to properly parent I.L. On February 20, 2020, the trial court appointed counsel for I.L.

{¶ 12} In March 2020, C.C. communicated she no longer wished to maintain custody of I.L. due to the child's behavior. The record indicates placement at that time was complicated due to the Covid-19 pandemic, and no services were available for an unspecified amount of time. On March 20, 2020, the agency filed a motion for legal custody with protective supervision to Mother. The motion stated that Mother substantially complied with the case plan by providing negative random urine screens; commencing counseling and therapy for herself and child; and starting unsupervised, overnight visits with I.L. without incident. On April 24, 2020, the magistrate found there was significant progress on the case plan by Mother and progress had been made in alleviating the cause for I.L.'s initial removal from Mother's home and, therefore, I.L. was committed to the legal custody of Mother with protective supervision.

{¶ 13} In June 2020, I.L. committed an act of domestic violence against Mother. Mother continued to resist family counseling and insisted that I.L. needed

assistance, but not Mother. The agency's referral of Mother and I.L. for Multi-System Therapy Services ("MST services") — a type of family counseling — was withdrawn due to Mother's lack of cooperation. In August 2020, I.L. began services at Bellefaire, but her participation was minimal.

{¶ 14} On September 30, 2020, the agency filed a motion to terminate protective supervision. On October 5, 2020, the GAL reported that Mother and I.L. were doing well except for the June 2020 domestic violence charge, and Mother had maintained housing and employment. The GAL reported that agency involvement was no longer required. However, later that month, a second domestic violence charge against I.L. resulted in I.L.'s placement in a shelter care and a second delinquency case against I.L.

{¶ 15} On November 2, 2020, the agency withdrew the September 30, 2020 motion and filed a motion for extension of protective supervision. The motion for extension stated that while Mother had made progress on the case plan, all objectives had not been met and the family needed continued assistance from the agency.

{¶ 16} The GAL's report filed on December 9, 2020, stated,

Mother has expressed a willingness to have the child in her [legal custody] however [Mother] has not appropriately handled the [delinquency] cases. She did not bring the child to several hearings even though she was properly notified and warned regarding the warrant issued.

* * *

> [M]other CANNOT handle [I.L.'s] behaviors when she is not compliant with therapy. Since the last several charges have been [domestic violence charges] against [M]other this GAL believes the child is in need of residential therapy until stabilized and until the proper supports are in place in the home.

The GAL recommended temporary custody for residential treatment. On December 11, 2020, the magistrate granted the agency's first extension of protective supervision until September 19, 2021.

{¶ 17} On December 26, 2020, I.L. moved in with Father, and on January 27, 2021, the agency filed a motion to grant legal custody to Father. On February 5, 2021, the magistrate conducted a hearing on that motion and learned that due to an incident between Father and I.L., Father no longer sought custody of I.L. Monica Seigers ("Seigers"), the agency's ongoing social worker, testified that Mother and I.L. had engaged inconsistently in family and individual counseling. Seigers testified that the agency initially filed a motion for legal custody to Father because Mother continually stated she did not want I.L. to return to her home. Seigers testified that Mother vacillated on whether she wanted custody of I.L., but Mother also stated that she did not want I.L. in the foster system. Seigers testified that Mother voiced the need for a residential treatment center. Seigers further testified that the agency could not place I.L. in a residential treatment center if they did not have custody of the child and I.L. had not scored high enough on the agency's residential criteria to be placed in that type of facility. Seigers testified that I.L. was currently at Mother's home and that is where I.L. wanted to stay.

{¶ 18} At the hearing, the GAL testified that I.L. had minimal engagement with therapy, and I.L.'s "behaviors have spiraled out of control" with two pending delinquency cases. Feb. 5, 2021 hearing, tr. 30. The GAL testified that I.L.'s receipt of in-person therapy was the critical issue. The trial court stated it could not order residential treatment, and I.L.'s participation in therapy was her parents' responsibility. The magistrate granted the agency's motion to modify Mother's legal custody with protective supervision to temporary custody with the agency. I.L. was placed with her maternal grandfather. On April 23, 2021, the agency placed I.L. with her maternal grandmother.

{¶ 19} On May 27, 2021, the agency filed a motion to modify temporary custody of I.L. to the permanent custody of the agency. Seiger's affidavit submitted with the motion stated, in pertinent part, that Mother failed to consistently participate in MST services or to demonstrate benefit from the services and parent-teen conflict persisted between Mother and I.L.

{¶ 20} As of August 2021, I.L. had been missing from the agency's care since April 2021, and stayed infrequently with her grandfather or grandmother but primarily with Mother. Mother felt her relationship with I.L. had improved and was willing to assume custody of I.L. On September 3, 2021, the agency filed a motion to vest legal custody with Mother, without restrictions.

{¶ 21} On September 10, 2021, the magistrate conducted a hearing at which Mother was not present. The magistrate was informed that I.L. ran away that morning from Mother's home. On October 14, 2021, the agency filed a notification

with the court that I.L. returned and was placed in a respite foster home while the agency sought a residential placement. I.L. ran away again on October 27, 2021.

{¶ 22} The agency filed a motion for permanent custody to the agency, and the magistrate held a hearing on that motion on December 2, 2021.[3] Mother did not attend the hearing but her counsel stated Mother opposed permanent custody to the agency. I.L.'s attorney stated that she had attempted to meet her client twice, but both times I.L. had run away from the agency's custody before she could contact the child. As a result, I.L.'s attorney could not state her client's preference for custody. I.L. was missing at the time of the hearing; the police brought I.L. to the agency's custody the day before, but she left the agency's care immediately.

{¶ 23} On January 31, 2022, the magistrate held a hearing to determine if the agency made reasonable efforts to finalize the permanency plan for I.L. Mother did not appear at that hearing. Seigers testified that Mother and I.L. previously engaged in and completed MST services from November 2020 through April 2021, but the provider's recommendation was that additional family and individual counseling was required due to the number of cancelled visits and ongoing concerns about I.L. Seigers testified that Mother and I.L. also participated in counseling with ACE Wellness; their last engagement with those services was in November 2021 when ACE Wellness was called to assist with an altercation between Mother and I.L. Seigers also testified that the agency's last contact with I.L. occurred on January 21,

---

[3] The agency filed a motion for permanent custody on October 25, 2021, which rendered moot the agency's previous motion for permanent custody filed on May 27, 2021.

2022, when the police delivered I.L. to the agency. On that day, I.L. remained in the agency's care for only four hours. The magistrate found the agency made reasonable efforts to reunify Mother and I.L.

{¶ 24} On February 1, 2022, the GAL filed a report that stated I.L. had been missing from the agency's custody since September 2021. The report stated that I.L refused to stay in any placement, including a foster placement. The report stated that due to an incident in Mother's home — where Mother caught I.L. having sex with a boy and the boy brought a gun into Mother's home — I.L. had not been at Mother's home. The report further stated that I.L. moved between the homes of Mother and maternal grandmother, and I.L. refused to follow the adults' rules. The GAL's report stated I.L. and Mother lacked engagement with agency services; Mother did not want to parent I.L.; and I.L. needed mental health services and residential placement. The GAL recommended permanent custody to the agency.

{¶ 25} On April 13, 2022, the trial court judge conducted an in camera interview of I.L. I.L. voiced her preference to live with Mother who provided her basic needs. The GAL testified that I.L.'s current treatment at ACE Wellness and her increased maturity were having a positive impact on Mother and I.L.'s relationship.

{¶ 26} On May 5, 2022, the agency filed a motion seeking termination of the agency's temporary custody. The agency's motion stated Mother successfully completed the case plan and resolved the risks that initially resulted in I.L.'s removal from the home. Specifically, the motion stated that Mother,

maintained the child in her home for an extended period without issues and ensured the child's basic needs [we]re met, including ensuring the child attend[ed] school and participate[d] in individual counseling. Mother [wa]s able to provide for the needs of the child on a daily basis and [wa]s willing to provide a permanent home for the child.

May 5, 2022, Motion to Amend the Dispositional Prayer at p. 3.

{¶ 27} A May 27, 2022 hearing on the agency's motion to terminate temporary custody was continued because Mother left the building before the court could conduct the hearing. On June 27, 2022, the magistrate held another hearing on the pending motion. The agency case worker in attendance, Dinita Williams ("Williams") had been on the case for only one week and could not testify with knowledge about the motion to terminate temporary custody; this was the fourth case worker assigned to the case since the last hearing. Williams testified that I.L. had been missing for some time from the agency's custody and, with the agency's full knowledge and support, I.L. was staying with Mother without a court order. Williams testified that I.L. had stopped attending services with ACE Wellness. Williams also testified that because Mother lacked legal custody, she could not enroll I.L. in school, counseling, or take her to a doctor. The trial court scheduled another hearing on the motion.

{¶ 28} According to the agency's July 29, 2022 SAR Report, I.L. had not regularly attended school, and she needed to repeat the ninth grade. The report also stated I.L. continued to engage in fights at school and was not engaged in therapeutic services. The report noted that out-of-home placement was not in the best interest

of the child. Additionally, while Mother previously stated she did not want custody of I.L., Mother reported that she wanted I.L. to live with her permanently.

{¶ 29} The magistrate conducted a hearing on August 1, 2022, on the agency's motion to terminate temporary custody, but Mother and the case worker supervisor failed to appear. The magistrate reset the hearing. On August 17, 2022, the agency requested permanent custody due to the length of time I.L. had been under the agency's care. Further, Williams's affidavit attached to the motion averred that Mother was currently unwilling to assume custody of I.L. On August 25, 2022, the magistrate conducted a hearing; Mother did not participate. The parties stipulated to reasonable efforts and the magistrate found it was not in I.L.'s best interest to continue residence in or return to Mother's care and custody. The prior order of temporary custody was continued pending the outcome of trial on the agency's motion for permanent custody.

{¶ 30} Throughout the case, the child's GAL submitted reports to the trial court on November 19, 2018 (recommending continued custody with C.C.), September 9, 2019 (recommending continued custody with C.C.), February 18, 2020 (recommending legal custody to C.C.), October 5, 2020 (recommending termination of protective services of Mother), December 9, 2020 ( recommending residential treatment), February 1, 2021 (recommending legal custody to Father), February 1, 2022 ( recommending permanent custody to the agency), May 9, 2022 (recommending termination of temporary custody), and December 4, 2022 (recommending permanent custody or planned permanent living arrangement

("PPLA")). The GAL's final report filed on December 4, 2022, stated that I.L. lacked cooperation with the agency or adults as evidenced by the fact that she ran away from the agency's custody for most of the duration of the case. The GAL noted that I.L. had been engaged with services and making improvements with ACE Wellness, but those improvements were temporary. The report noted that I.L. was suspended from school and did not regularly attend classes. The GAL stated that I.L. moved between the homes of Mother, maternal grandmother, an aunt, and other friends. The report noted that I.L.'s parents were no longer willing to provide care, and the GAL's recommendation was permanent custody to the agency or PPLA.

{¶ 31} On December 9, 2022, the trial court conducted trial on the agency's motion for permanent custody. Mother and Father did not participate. The court heard testimony from Williams, who was assigned to the case in June 2022, and I.L.'s GAL. Williams testified that the agency sought the permanent custody of I.L. because neither parent was committed to the child. Williams testified that neither Father nor Mother wanted custody of I.L., and neither was willing to provide a safe and permanent home for I.L. Williams testified that when I.L. lived with Mother, Mother failed to send I.L. to school. She further testified that Mother did not "totally commit" to the case plan services and the agency thought she needed additional referrals. Williams testified that Mother refused to engage in services, and Mother indicated only I.L. needed services. Williams further testified that Mother did not ensure I.L. engaged in services but left the decision of I.L.'s participation up to the child. Williams testified that I.L. regularly participated in ACE Wellness services in

the spring of 2022, but stopped when the child ran away. Williams testified that although she had not performed a placement interview because she did not have any contact with the child, Williams recommended I.L. be placed in a residential facility. Williams further testified that a residential facility could potentially provide a diagnosis for I.L. and, if needed, necessary medications. Williams testified that I.L. called her a few times each month to provide her current phone number. During those calls, I.L. refused to provide her address and stated she was not attending school because she did not want to do so.

{¶ 32} The GAL for I.L. also testified at the custody trial. The GAL testified that this matter was a long-term case in which little change had occurred over four years. The GAL testified that I.L.'s placement was driven by the child's own wishes and decisions. The GAL testified that I.L. had moved between the homes of her Mother, Father, maternal grandmother, and a foster home, and I.L. refused to stay in the agency's care. The GAL testified that at times Mother appeared to engage with the agency and indicate her intention to follow through with the case plan and the services needed for I.L., but Mother had never pursued these actions on a consistent and fruitful basis. The GAL testified that she was concerned that no one knew of I.L.'s current whereabouts. The GAL further testified that I.L. needed a legal custodian:

> So I don't know of anyone else that's available to be legal custodian for her. She obviously needs a legal custodian. So I have nothing to recommend except for permanent custody. Although it is a concern that we don't really know where the child is located.

I mean — and I know age — I — I would like a PPLA to be considered, but I understand she's not of the age right now, but perhaps in the future that's something to keep on the table.

Dec. 9, 2022, Custody Hearing Tr. 32. Following the custody trial testimony, the trial court terminated the prior order committing I.L. to the temporary custody of the agency; terminated the parental rights and responsibilities of Mother and Father; and committed I.L. to the permanent custody of the agency.

{¶ 33} On December 14, 2022, Mother filed a timely notice of appeal from the trial court's December 9, 2022 judgment entry and presented a single assignment of error for review:

> The trial court abused its discretion by granting permanent custody of appellant's children [sic] to CCDCFS against the manifest weight of the evidence.

**Legal Analysis**

{¶ 34} In her sole assignment of error, Mother argues that the trial court's grant of permanent custody to the agency was against the manifest weight of the evidence.

{¶ 35} A parent has a fundamental interest in the care and custody of her children. *In re L.W.*, 8th Dist. Cuyahoga No. 107708, 2019-Ohio-1343, ¶ 20. However, parental rights are not absolute: "'The natural rights of a parent are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, 86 N.E.3d 1012, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979). "By terminating parental rights, the goal is to create 'a more stable life'

for dependent children and to 'facilitate adoption to foster permanency for children.'" *In re R.G.*, 8th Dist. Cuyahoga No. 104434, 2016-Ohio-7897, ¶ 21, quoting *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 67, citing *In re Howard*, 5th Dist. Tuscarawas No. 85 A10-077, 1986 Ohio App. LEXIS 7860, 5 (Aug. 1, 1986).

{¶ 36} Pursuant to a motion for permanent custody under R.C. 2151.413, a juvenile court must satisfy the two-prong test set forth in R.C. 2151.414 before it can terminate parental rights and grant permanent custody to the agency. The juvenile court must find by clear and convincing evidence that any one of the conditions set forth in R.C. 2151.414(B)(1)(a) through (e) apply and that it is in the best interest of the child to grant permanent custody to the agency. *In re R.G.*, 8th Dist. Cuyahoga No. 108537, 2020-Ohio-3032, ¶ 22.

{¶ 37} Clear and convincing evidence has been defined as "'that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 38} We examine the record to determine whether the juvenile court had sufficient evidence to meet the required degree of proof. "Judgments supported by competent, credible evidence going to all the essential elements of the case will not

be reversed as being against the manifest weight of the evidence." *In re L.W.*, 8th Dist. Cuyahoga No. 107708, 2019-Ohio-1343, at ¶ 24, citing *In re T.S.*, 8th Dist. Cuyahoga No. 92816, 2009-Ohio-5496, ¶ 24, citing *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990).

**R.C. 2151.414(B)(1) Statutory Requirements**

{¶ 39} The trial court must find by clear and convincing evidence that one of the following conditions applies:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated

an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

R.C. 2151.414(B)(1).

{¶ 40} Here, the trial court satisfied the first prong of the statutory test by finding that (1) I.L. was in the agency's custody for 12 months or longer of a consecutive 22-month period pursuant to R.C. 2151.414(B)(1)(d), and (2) I.L. was abandoned in accordance with R.C. 2151.414(B)(1)(b). Pursuant to R.C. 2151.414(B)(1), I.L. was in agency custody from November 2, 2018, through April 26, 2020, and again from April 6, 2021, through August 17, 2022, when the agency filed a motion for permanent custody. Even though I.L. was under Mother's care and custody from approximately April 2020, through February 2021, the record demonstrates that I.L. was in the agency's care for greater than 12 months during a consecutive 22-month period. *See In re N.M.P.*, 160 Ohio St.3d 472, 2020-Ohio-1458, 159 N.E.3d 241, ¶ 23-25.

{¶ 41} The record reflects that during the time I.L. was in the agency's temporary custody, she often ran away and returned to Mother's home. However, the fact that I.L. stayed with Mother during the time the agency was granted legal custody of the child did not alter the determination that I.L. was in the agency's custody for 12 months or longer. *See In re I.D.*, 7th Dist. Columbiana No. 09 CO 13, 2009-Ohio-6805, ¶ 63 ("When the agency has temporary custody but physical custody is given to the parent, the time spent in the parent's physical custody counts

toward the twelve months in the '12 of 22' provision because the language of the '12 of 22' provision uses the term 'temporary custody,' not 'physical custody.'").

{¶ 42} Once the trial court found that I.L. was in the agency's custody as required under R.C. 2151.414(B)(1)(d), the agency satisfied the first prong of the statutory test. As a result, we need not assess the application of R.C. 2151.414(B)(1)(b) — abandoned — to the instant matter.

**Best Interest Analysis — R.C. 2151.414(D)(1)(a)-(e)**

{¶ 43} Once the trial court found that one of the enumerated R.C. 2151.414(B)(1) factors was present, the court then conducted an analysis of the child's best interest. The trial court had to find by clear and convincing evidence that a grant of permanent custody to the agency was in I.L.'s best interest. *In re L.W.*, 8th Dist. Cuyahoga No. 107708, 2019-Ohio-1343, at ¶ 36.

{¶ 44} To determine the best interest of the child, a trial court considers the statutory factors listed in R.C. 2151.414(D)(1)(a)-(e):

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in (D)(1) of

section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

Not one factor listed in R.C. 2151.414(D)(1) is given greater weight than any other factor. *In re L.W.* at ¶ 39, quoting *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. Only one of the statutory factors needs to be found in favor of the award of permanent custody. *Id.,* citing *In re Moore*, 8th Dist. Cuyahoga No. 76942, 2000 Ohio App. LEXIS 3958 (Aug. 31, 2000). The focus of a best interest determination is the child, not the parent. *In re R.G.,* 8th Dist. Cuyahoga No. 104434, 2016-Ohio-7897, at ¶ 28, citing *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, at ¶ 59.

{¶ 45} The trial court stated in its December 13, 2022 judgment entry that it relied upon the R.C. 2151.414(D)(1)(a)-(d) factors and the GAL report to determine by clear and convincing evidence that a grant of permanent custody was in I.L.'s best interest and that I.L. could not be placed with one of her parents within a reasonable time or should not be placed with either parent. A review of the record shows a grant of permanent custody to the agency was in I.L.'s best interest.

{¶ 46} Mother neither attended nor testified at the custody hearing. However, a review of the record reveals that Mother and I.L. had a tumultuous relationship. The agency initially removed I.L. in September 2018 because of

conflict between I.L. and her Mother and inappropriate discipline. Mother saw I.L. only three times for the first year of this case. Mother made more of an effort to comply with her case plan starting in August 2019, and in April 2020 the court granted Mother legal custody with protective supervision. While I.L. was in Mother's legal custody, I.L. was charged with two separate counts of domestic violence against Mother. It is uncertain how the lack of services at that time — due to the Covid-19 pandemic — impacted I.L.'s behavior. While she had legal custody of I.L., Mother vacillated on whether she wanted I.L. in her home. In February 2021, the court terminated Mother's legal custody with protective supervision and again granted the agency temporary custody.

{¶ 47} While the agency had temporary custody of I.L. throughout 2021 and 2022, the child regularly fled the agency's care — including a foster home — and often returned to live with Mother. On occasions, I.L. also ran away from Mother's home. At the time of the custody hearing in December 2022, the agency worker testified that according to Mother, I.L. was living with her and "she comes and goes." Dec. 9, 2022, tr. 19. Williams testified at the custody trial that neither Mother nor Father was willing to accept custody of I.L. and no relatives were available to do so.

{¶ 48} I.L. informed the trial court that she wished to be under Mother's care and custody. The child's GAL testified that I.L. required a legal custodian and the only option appeared to be the agency.

{¶ 49} The agency had temporary custody of I.L. from September 2018 through December 2022, except for a nine-and-a-half-month break between April

2020 through February 2021 when Mother had temporary custody with protective supervision.

{¶ 50} The record supports the finding that I.L., who came into the agency's temporary custody at 11 years old and was 15 years old at the time of the custody hearing, needed a legally secure permanent placement that could only be accomplished with permanent custody to the agency. I.L. had been subject to multiple placements including a paternal cousin, Mother, Father, grandparents, and agency care. I.L. had run away from the care and custody of all those providers although she frequently returned to Mother's care. Mother had been inconsistent in her own engagement with services and her supervision of I.L.'s engagement with services. While I.L. was often missing during the time she was under the agency's temporary custody, no other relative — including Mother — was willing to accept custody of I.L. at the time of the custody trial.

{¶ 51} Mother argues that I.L.'s need for a secure placement could have been achieved without a grant of permanent custody. Specifically, Mother argues that she made progress on her case plan, she was involved, and wanted to help I.L. Mother contends that the record does not show she was unable to properly care for I.L. In contrast to this argument, the trial court determined and the record supports the finding that pursuant to R.C. 2151.414(E) — and specifically paragraphs (E)(1), (3), (4), (14), and (16) — I.L. could not be placed with either parent within a reasonable time or should not be placed with either parent. Upon the determination that one of the enumerated R.C. 2151.414(E) factors existed, the court was mandated to find

the child could not or should not be placed with either of her parents within a reasonable period of time. *In re Mayle*, 8th Dist. Cuyahoga Nos. 76739 and 77165, 2000 Ohio App. LEXIS 3379, 21 (July 27, 2000), quoting *In re Higby*, 81 Ohio App.3d 466, 469, 611 N.E.2d 403 (8th Dist.1992) ("The intent of the legislature was to eliminate any discretion on the part of the court when one of the conditions exists.").

{¶ 52} Mother also argues that the trial court should have extended temporary custody until I.L. turned 16 years old and then explored PPLA pursuant to R.C. 2151.415. Williams did state at the custody trial that she recommended I.L.'s placement in a residential facility. However, the agency never filed a motion seeking an order to place I.L. in PPLA, as required under R.C. 2151.415(A)(5). Further, it is mere speculation that I.L. would qualify for PPLA; the record includes agency worker testimony that I.L. had not scored high enough on the agency's residential criteria to be placed in residential care. Additionally, a child must be 16 years old to qualify for PPLA. R.C. 2151.353(A)(5). I.L. was only 15 years old at the time of her custody trial. And the agency could not seek a continuation of temporary custody beyond February 10, 2023 — two years after the child's most recent placement into shelter care. R.C. 2151.415(D)(4). As of February 10, 2023, I.L. would still be only 15 years old and ineligible for PPLA.

{¶ 53} I.L. voiced her preference to be placed with Mother but the remaining factors supported the trial court's finding that it was in the child's best interest to be placed in the agency's permanent custody. We acknowledge that the agency filed

numerous motions to change the disposition of I.L., and some of the motions presented contradictory statements about Mother's compliance with her case plan. While we do not condone such acts by the agency, we note that Mother's willingness to accept custody of I.L. wavered throughout the pendency of the case and I.L.'s behavior — such as her attendance at school and her living arrangements — was inconsistent. Additionally, Mother's attendance at court hearings was sporadic — most notably when she did not attend the hearings scheduled on December 2, 2021 (permanent custody hearing), January 2, 2022 (reasonable efforts hearing), May 24, 2022 (termination of agency's temporary custody), August 25, 2022 (reasonable efforts hearing), and December 9, 2022 (custody trial) — and may well have impacted the agency's decisions. Further, even if Mother had met all of her case plan goals to the satisfaction of the agency and court, it is well established that

> [a] parent can successfully complete the terms of a case plan yet not substantially remedy the conditions that caused the children to be removed — the case plan is simply a means to a goal, but not the goal itself. Hence, the courts have held that the successful completion of case plan requirements does not preclude a grant of permanent custody to a social services agency.

*In re S.P.*, 8th Dist. Cuyahoga No. 111081, 2022-Ohio-2277, ¶ 38 (internal citations omitted), quoting *In re C.C.*, 187 Ohio App.3d 365, 2010-Ohio-780, 932 N.E.2d 360, ¶ 25 (8th Dist.).

{¶ 54} Based upon the record, the trial court's grant of permanent custody to the agency was not against the manifest weight of the evidence. Mother's assignment of error is overruled.

**{¶ 55}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, JUDGE

KATHLEEN ANN KEOUGH, P.J., and
MARY J. BOYLE, J., CONCUR