[Cite as *In re Da.R.*, 2019-Ohio-2270.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SHELBY COUNTY

IN RE:

        CASE NO. 17-18-13

    DA.R.

ADJUDGED DEPENDENT CHILD.

[FELICITY BERRY - APPELLANT]        O P I N I O N
[JOSHUA ROSS - APPELLANT]

Appeal from Shelby County Common Pleas Court
Juvenile Division
Trial Court No. 2016-DEP-0002

Judgment Affirmed

Date of Decision:  June 10, 2019

APPEARANCES:

    *Kristina M. Morris* for Appellant Felicity Berry

    *Jeremy M. Tomb*, for Appellant Joshua Ross

    *Aaron Lowe* for Appellee

Case No. 17-18-13

**WILLAMOWSKI, J.**

{¶1} Appellants Felicity Berry ("Berry") and Joshua Ross ("Ross") bring this appeal from the judgment of the Court of Common Pleas of Shelby County, Juvenile Division terminating their parental rights. Both parties challenge the decision of the trial court finding that it was in in the best interest of the children to terminate their rights. For the reasons set forth below, the judgment is affirmed.

{¶2} Da.R. was born in July of 2016 to Berry and Ross. Doc. 2. Before Da.R. was released from the hospital, the Shelby County Department of Job and Family Services ("the Agency") filed a complaint to take temporary custody of the child. Doc. 1. The basis for the complaint was that Da.R.'s older sibling was removed from the home in July of 2015 due to dependency and that the reasons for the removal had yet to be remedied.[1] Doc. 2. The trial court granted an ex parte emergency custody motion and set the matter for a hearing. Doc. 4. This entry noted that the Agency had made reasonable efforts to prevent the child from being removed from the home. *Id.* The hearing was held on July 18, 2016. Doc. 25. After the hearing, the trial court ordered that Da.R. would remain in the temporary custody of the Agency and determined that reasonable efforts had been made by the Agency to make a permanency plan. *Id.* On July 22, 2016, the Agency filed a case plan for the family. Doc. 22. The plan required Berry and Ross to 1) cooperate with

---

[1] The family had been involved with the Agency since December of 2014, but the older sibling was not removed until July of 2015.

-2-

parenting coaches regarding child care, home maintenance and safety, finances; 2) cooperate with medical experts to meet the child's developmental and medical needs; 3) cooperate with developmental disabilities services; 4) cooperate with the professional advice offered by the team; and 5) complete psychological evaluations and complete mental health services recommended. *Id*.

{¶3} On August 25, 2016, an adjudicatory hearing was held. Doc. 38. Both Berry and Ross admitted at the hearing that Da.R. was a dependent child. *Id*. The trial court then made that finding and ordered that Da.R. remain in the temporary custody of the Agency pending disposition. *Id*. The trial court also determined that the Agency had made reasonable efforts "to eliminate the removal of the child from the home of a parent, however due to the parents' inability to provide proper care for the child at this time, it is in the child's best interest to remain in the custody of [the Agency]." *Id*.

{¶4} On October 6, 2016, the GAL filed her report regarding the disposition of the matter. Doc. 41. The GAL indicated that she had personally visited with the child, Ross, Berry, the foster parents, the home coaches, the caseworker, and other people. *Id*. The GAL also indicated that she had reviewed the Agency's case file and the home studies. *Id*. The GAL recommended that custody remain with the Agency. *Id*. The disposition hearing was held on October 13, 2016. Doc. 43. The trial court ordered that Da.R. would remain in the temporary custody of the Agency. The trial court also adopted the case plan previously filed by the Agency. *Id*.

**{¶5}** On November 1, 2016, the Agency filed a motion for permanent custody of Da.R. and his older sibling. Doc. 47. The Agency then filed an amended case plan on December 1, 2016, which reflected the change of goal from reunification to adoption. Doc. 59. However, this motion was subsequently withdrawn.[2] Doc. 88.

**{¶6}** On July 19, 2017, the Agency filed its annual review of the case plan. Doc. 107. The review showed that although Berry and Ross had completed the psychological evaluations and were continuing to work with mental health services, there was only some progress on the case plan. *Id.* A new case plan was filed on November 2, 2017, when Da.R. was moved to a new foster home. The case plan was again modified on November 13, 2017, when his older sibling was removed from the case plan due to permanent custody of the sibling having been granted to the Agency. Doc. 121. The modified plan contained the same requirements as the previous plans.

**{¶7}** On February 8, 2018, the Agency file a motion for permanent custody of Da.R. Doc. 127. The basis for the motion was that Da.R. had been in the custody of the Agency for twelve or more months of the prior twenty-two month period, that the parents had failed to remedy the conditions causing the placement out of the home and that termination of parental rights would be in the best interest of Da.R.

---

[2] A new motion for permanent custody of Da.R.'s older sibling was evidently filed by the Agency at a later date, but did not apply to Da.R. See Doc. 94.

*Id.* The GAL filed her report regarding the motion for permanent custody on June 8, 2018. Doc. 182. The GAL noted that Da.R. is developmentally behind and has physical issues which require weekly speech therapy, physical therapy, and occupational therapy. *Id.* She also noted that Da.R. wears glasses and has "braces" on his feet due to muscle weakness. *Id.* The GAL indicated that although the parents have provided a stable home, it has not been maintained in a safe and clean manner for extended periods of time without help. *Id.* The GAL noted that she had spoken repeatedly with the parents, the foster parents, and the team members. *Id.* She also noted that she had reviewed all of the records in the file. *Id.* The GAL then made the following conclusions in her report.

> **Although this is very unfortunate for all concerned, [Ross and Berry], in my opinion <u>cannot safely</u> take care of [Da.R.] without a level of constant supervision. This is apparent due to the abundant resources that have been given to them during this past 23 month period. For all of the resources, there has been little to no consistent improvement in [Ross and Berry's] parenting skills to warrant more time with the parents to the detriment of [Da.R.].**
>
> **Bottom line is that [Ross and Berry] have made <u>NO advances</u> in the area of following instructions: home safety (i.e. dresser drawers standing open, expired food in the refrigerator, dirty dishes, etc.); marking important appointments on the calendar; taking accurate notes at doctor's appointments for future reference even though there has been constant and consistent help given to them through [the Agency].**
>
> **Therefore, I recommend the following actions be taken:**
> **\* Custody: Permanent custody should be given to [the Agency] <u>immediately</u>.**
> **\* Placement: [Da.R.] should be placed for adoption <u>immediately</u>.**

Case No. 17-18-13

*Id*. at 5-6.

{¶8} The permanent custody hearing was held from June 18 to June 22, 2018. On August 21, 2018, the trial court entered judgment granting the Agency's motion for permanent custody and terminating the parental rights of Berry and Ross. Doc. 217. Both parents filed timely notices of appeal. The following assignments of error are raised on appeal.

**Berry's First Assignment of Error**

**[The Agency] failed to provide reasonable case planning and diligent efforts to assist [Berry] to remedy the conditions that initially caused the removal of the minor child from the home.**

**Berry's Second Assignment of Error**

**[The Agency] failed to show by clear and convincing evidence that the permanent parental rights of [Berry] should have been terminated.**

**Berry's Third Assignment of Error**

**The trial court violated [Berry's] U.S. Constitutional Fourteenth Amendment Right to due process and equal protection under the law.**

**Ross' First Assignment of Error**

**The trial court's decision was against the manifest weight of the evidence because the evidence did not support a finding that termination of parental rights of [Ross] was in the child's best interest.**

**Ross' Second Assignment of Error**

**The trial court's decision was against the manifest weight of the evidence because the evidence did not support finding that [the**

**Agency] made reasonable efforts to prevent the removal of the child or effect reunification.**

*Manifest Weight of the Evidence*

{¶9} Berry, in her second assignment of error, and Ross, in his first assignment of error, both allege that the trial court's determination to terminate their parental rights was against the manifest weight of the evidence, the burden of proof being clear and convincing evidence. The right to parent one's own child is a basic and essential civil right. *In re Murray*, 52 Ohio St.3d 155, 556 N.E.2d 1169 (1990). "Parents have a 'fundamental liberty interest' in the care, custody, and management of their children." In re Leveck, 3d Dist. No. 5–02–52, 5–02–53, 5–02–54, 2003–Ohio–1269, ¶ 6. These rights may be terminated, however, under appropriate circumstances and when all due process safeguards have been followed. *Id.* When considering a motion to terminate parental rights, the trial court must comply with the statutory requirements set forth in R.C. 2151.414. These requirements include, in pertinent part, as follows.

> **(B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:**
>
> **(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * * and the**

**child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.**

**\* \* \***

**(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period \* \* \*.**

**\* \* \***

**For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to [R.C. 2151.28] or the date that is sixty days after the removal of the child from the home.**

 **\* \* \***

**(C)  In making the determination required by this section \* \* \*, a court shall not consider the effect the granting of permanent custody to the agency would have upon any parent of the child.  A written report of the guardian ad litem of the child shall be submitted to the court prior to or at the time of the hearing held pursuant to division (A) of this section \* \* \* but shall not be submitted under oath.**

**If the court grants permanent custody of a child to a movant under this division, the court, upon the request of any party, shall file a written opinion setting forth its findings of fact and conclusions of law in relation to the proceeding.  The court shall not deny an agency's motion for permanent custody solely because the agency failed to implement any particular aspect of the child's case plan.**

**(D)(1) In determining the best interest of a child at a hearing held pursuant to division (A) of this section \* \* \* the court shall consider all relevant factors, including, but not limited to, the following.**

**(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;**

**(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;**

**(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies \* \* \* for twelve or more months of a consecutive twenty-two month period \* \* \*.**

**(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency.**

**(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.**

R.C. 2151.414. A court's decision to terminate parental rights will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which a court can determine by clear and convincing evidence that the essential statutory elements for a termination of parental rights have been established. *In re S.L.*, 3d Dist. Shelby Nos. 17-17-17, 17-17-18, 17-17-19, 2018-Ohio-900, ¶ 24.

{¶10} The determination whether to grant a motion for permanent custody requires a two-step approach. *In re L.W.*, 3d Dist. Marion Nos. 9-16-55, 9-16-56, 2017-Ohio-4352, ¶ 5. The first step is to determine whether any of the factors set forth in R.C. 2151.414(B)(1) apply. *Id.* If one of those circumstances applies, then

the trial court must consider whether granting the motion is in the best interest of the child by considering the factors set forth in R.C. 2151.414(D). *Id.*

**{¶11}** The motion for the termination of parental rights in this case alleged that Da.R. had been in the temporary custody for more than 12 out of the prior 22 month period. The record shows that Da.R. was "removed" from the home officially on July 15, 2016. Doc. 4. The trial court adjudicated Da.R. as dependent on September 7, 2016. This date is less than sixty days after the removal from the home, so September 7, 2016, is the date to be used in the calculation. R.C. 2151.414(B)(1)(e). The Agency filed its motion for permanent custody on February 8, 2018. Doc. 127. This is 17 months after the September 7, 2016, finding of dependency. Thus, the factor under R.C. 2151.414(B)(1)(d) was met.[3]

**{¶12}** The next step is to determine whether the termination of parental rights was in the best interest of Da.R. A review of the judgment entry indicates that the trial court considered the factors set forth in R.C. 2151.414(D). The trial court specifically addressed each of the factors. Doc. 217. As to Da.R.'s relationships with others, the trial court indicated that Berry and Ross both loved Da.R. and wanted to have him with them. Janice Geise ("Geise"), as the in-home coach and visit supervisor, testified that Da.R. was happy to see Berry and Ross for the visits,

---

[3] This Court notes that the trial court also addressed the need to terminate parental rights under R.C. 2151.414(B)(1)(a), (E)(1 & 2). However since the time requirements are met, we need not address whether these requirements were also met. The statute provides that the trial court should move on to consider the best interest factors if any of the conditions under R.C. 2151.414(B)(1) are met.

but was also happy to return to the foster home. June 19 Tr. 275 Jody Ross ("Jody"), the foster mother, testified that Da.R. was very attached to her husband and to herself. June 20 Tr. 123. Jody testified that Da.R. was "a huge part of the family." *Id*. at 124. Da.R.'s older sibling is also in the home and Jody testified that they "are the best of friends and they pick on each other back and forth all day long."[4] *Id*. at 124. Jody also testified that she and her husband intended to adopt Da.R. if the parental rights were terminated. *Id*. at 148.

{¶13} The next factor is the wishes of the child. R.C. 2151.414(D)(1)(b). As Da.R. was approximately 23 months as of the hearing date, he was too young to express his own wishes directly. However, the GAL in her report recommended that permanent custody be given to the Agency and that he be placed for adoption. Doc. 182. During the hearing, the GAL testified as follows.

> **A. In my opinion, [Da.R.'s] best interests is that he remain with Jody and Tom Ross at this point in the agency's custody.**
>
> **Q. And why is that?**
>
> **A. Because I do not believe that the parents are capable and some cases willing to do what it takes to safely and properly care for this child and I honestly and truly believe with all my heart and I know [Ross and Berry] love this child with all their heart and soul but I truly believe that if he were to return home with them, I fear for that child's life and well-being.**
>
> \* \* \*

---

[4] Berry's and Ross' parental rights to Da.R.'s older sibling were terminated in 2017.

-11-

**Q. Is there anything else that you would like to tell the Court at this point?**

**A. Just that [it's] my job and my position to advocate for this child and I believe I've done that to the best of my ability and with all the things that I have researched, all the things that, meetings I've been to, to home visits I've been to, everything that I have done towards these reports and towards finding out what's best for [Da.R.], um, I've done all I know to do and that's what I firmly believe is best for this child.**

June 20 Tr. 257. The GAL also testified that the only alternative situation she could see would be one where a custodian was appointed to live with the parents and keep watch over the entire family at all times. *Id*. at 264.

{¶14} The third factor in the best interest consideration is the custodial history of the child. R.C. 2151.414(D)(1)(c). As was noted above, Da.R. was removed from his parents' custody at birth. He went straight from the hospital to a foster home. Thus his entire life was spent living with foster parents. The Agency had temporary custody of Da.R. for over 23 months.

{¶15} The fourth factor is the child's need for a legally secure permanent placement and whether that can be achieved without a grant of permanent custody to the Agency. R.C. 2151.414(D)(1)(d). The trial court specifically found as follows.

**Da.R. has been in the care of [the Agency] all of his young life. He is in need of long term stability and the Court finds it would be detrimental to Da.R. to allow this situation to continue or to return him to his parents. There is simply no indication that further case plan efforts with the either parent [sic] would be**

-12-

> **beneficial to Da.R. His placement in foster care has seen an enormously positive effect on his health and overall well-being.**

Doc. 217 at 10. Additionally, throughout the judgment entry, the trial court noted that Da.R. had extensive medical issues that would likely be continuing throughout his lifetime. *Id*. at 4-5. These issues require constant care, numerous therapies, and numerous doctor's visits. *Id*. The trial court noted that it was critically important that the caregivers be proactive and responsive to Da.R.'s conditions.

{**¶16**} Finally, the trial court noted that the fifth factor was whether certain conditions applied, which were not relevant to this case as they did not apply. R.C. 2151.414(D)(1)(e) and Doc. 217 at 10. Reviewing the record, all of the findings made by the trial court were supported by competent credible evidence. Based upon the evidence before it, the trial court determined that it would be in the best interest of Da.R. for the parental rights of Berry and Ross to be terminated and permanent custody be granted to the Agency. This court notes that the conclusions of the trial court were supported by clear and convincing evidence in the record and therefore the trial court's judgment was not against the manifest weight of the evidence and was not an abuse of discretion. Thus Berry's second assignment of error and Ross's first assignment of error are overruled.

*Reasonable Efforts by the Agency*

{**¶17**} Berry's first assignment of error and Ross' second assignment of error both allege that the Agency failed to make reasonable and diligent efforts to reunify

them with Da.R. When the Agency intervenes to protect a child's health or safety, the efforts by the state to permit the child to return home by removing the threat are called "reasonable efforts". *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 28, 862 N.E.2d 816. The Agency must show that it made reasonable efforts before the parental rights may be terminated. *Id*. at ¶ 43.

{¶18} In this case, the Agency put forth evidence that it had prepared multiple case plans to help Berry and Ross. The parents were eligible for services through the Shelby County Board of Developmental Disabilities. June 18 Tr. 64, 139. This included assistance with paying bills, obtaining transportation, shopping, and cleaning the home. Rather than sending the parents to parenting classes, two parent coaches were provided to work one-on-one with the parents. The coaches attempted to teach the parents how to care for their children and how to make the home a safe environment. They all testified that they had adjusted their coaching to account for the mental deficiencies of the parents. They also attempted to work with the parents on how to make calendars to keep track of all of Da.R.'s medical appointments. Psychological evaluations were scheduled and completed. Doc. 77. The psychologist noted that the parents would require ongoing assistance with caring for the children. *Id*. However, the psychologist noted that a continuation or increase in services would not likely result in the necessary changes. *Id*. Both parents were offered counseling sessions which they sometimes attended. *Id*. The

final case plan review was filed by the Agency on July 11, 2018.  Doc. 214.  In that review, the Agency noted several issues.

**1) BASIC NEED PROVISION:  * * * The parents continue to present as unable to safely and consistently meet the needs of this child.**

**2) NO CONTACT CONDITION:  [Berry and Ross] lack the ability to discern safe, appropriate persons to be associated with which would impact the safety of [Da.R.].  The parents have been described as very naïve, vulnerable, and easily taken advantage of.  These individual aspects have not changed over time. * * ***

**3) PARENT EDUCATION/COACHING:  Since January of 2018 Coach Cavinder has been assigned to provide in-home education and support services.  Home safety and cleanliness has been a focus with improvements noted during this review period but consistency of such has required the work of the coach and an increase in-home hours provided by REM staff.  Coach Cavinder has implemented a chore chart but notes that [Berry] is believed to be working and completing with [Ross] having limited involvement.  This noted to be the same attitude sensed by SSA Kris Anderson (per phone conversation held with CW Reindel on 6/4/18).  During this review period, there has been expired foods; unsealed food on the counter (cereal); trash needing disposed of; no body wash/soap throughout the month of May; noted failure to completely and accurately track appointments.  Coach Geise continues to be primary coach/educator during parent-child contacts which was held two times per week for a total of four hours per week.  Coach Geise continues to work on inconsistency with the parenting and independent living aspects (i.e. hygiene, proper nutrition, parent-child activities/developmental exercises). Attendance has been positive.**

**4) HOME MAINTENANCE/SAFETY/BASIC PROVISION: With continued inconsistencies with home maintenance (i.e. cleanliness and safety), Coach Cavinder has been providing weekly service attention.  In addition, REM staff coverage has been increased providing attention on Friday for 6 hours. Focus of attention has been on cleaning, organizing, nutrition,**

**scheduling/tracking appointments, transportation, grocery shopping, financial aspects, etc. It was during this review period that [Berry] ran her cell phone bill up to $800. The couple has been missing appointments due to their lack of planning and timely communication (i.e. counseling and medical appointments). In sum, the challenges that were present from the onset of this case remain relevant to date. Even with an array of service providers, the parents are failing to demonstrate an overall ability to manage all that is required for safe, effective parenting.**

**\* \* \***

**6) DEVELOPMENTAL DISABILITES SERVICES: [Berry and Ross] continue to be clients of the Shelby County Board of DD and are each assigned an SSA (Julie Mauer and Kris Anderson). [Berry and Ross] receive services through REM and have a payee to assist with their bills. [Berry] continues to work at Krogers but is wanting to find another job with consistent hours and more pay. [Berry] is working towards obtaining her driver's license. [Ross] continues to work part-time receiving job coaching services. It has been reported that [Ross and Berry] are receiving transportation and in-home attention through REM but this is not producing lasting results. The SSAs have also attempted to assist with transportation and direction otherwise (i.e. counseling).**

*Id.* The report also mentioned that Ross and Berry were receiving counseling services, but that Ross had stopped going in November of 2017 and Berry had stopped attending in March of 2018 despite both being recommended for continuing counseling. *Id.* The report noted that the parents fluctuated in their level of cooperation, communication and participation with the services offered. *Id.* The Agency even attempted to place the parents themselves in a family foster home setting so that Da.R. could be returned to them in a supervised capacity, but that plan did not come to fruition. June 21 Tr. 41. Additionally, the Agency contacted

-16-

numerous programs which deal with the developmentally disabled all in the hopes of finding a permanent support system for the parents which would allow Da.R. to be returned to the home. *Id.* Nothing was identified that would work. When asked specifically what efforts the Agency had made to return Da.R. to his parents, the caseworker testified as follows.

> **A. The agency has and providers have offered and provided services through a number of avenues, different agencies over the course of time such as the Children and Family First Council, the Help Me Grow program as well as Help Me Grow Early Intervention program, a vast array of medical professionals, Shelby County Board of DD, day care services and assistance, the Shelby County Health Department, support and assistance through informal support persons such as the Justice family, support services through REM, we explored different options as I stated with a [sic] in-home services, out of home services, Rustic Hope was involved, Wilson Health Professionals, Right to Live, parent education and coaching staff, Interaction and Learning Opportunities through Kids Learning Place, foster caregivers involvement, modeling and interactions, communication with, like I'd said, other organizations and associations associated with the DD population, communication with the parents' attorney to try to get assistance in direction. Extensive research by the CASA, myself, the Board of DD to look at options and I need to include [Berry] in that. My goodness, she did a lot of internet searching. Public, County and private transportation assistance, payee services, Prevention Retention Contingency Assistance, PRC, Shelby County Department of Job and Family Services and we're talking medical coverage, day care assistance, direction, the Children Services division, we're talking all kinds of training tools and techniques and approaches, we've reviewed that already. We would also have to note that again, [it has] been more than 12 out of 22 months of opportunity, we're approaching this boy's second birthday now.**

*Id.* at 45.   The caseworker testified that despite everything they tried and all the resources devoted to helping the parents, they still could not safely care for the child. Numerous witnesses testified that they had devoted more time and energy to helping these parents than any other parent, yet they all admitted that they did not think that the parents could care for Da.R. without intense supervision.   Given all of the evidence before it, the trial court did not abuse its discretion in determining that the Agency had made reasonable efforts to reunify Da.R. with his parents.   Thus, Berry's first assignment of error and Ross' second assignment of error are overruled.

*Due Process*

{¶19} In her third assignment of error, Berry argues that she was denied due process because she has a fundamental right to parent her child.   Berry claims that by terminating her parental rights, she was denied the protection of the law.   As part of her argument, Berry points to numerous factors she claims would allow her to parent Da.R.   Although the trial court, and this court, agree that there were multiple times the parents made the home a safe and suitable place for Da.R. to reside, this does not account for the fact that these conditions were not consistent.   The trial court held a hearing at which Berry heard all the evidence presented.   She had the right to cross-examine other witnesses and exercised that right.   She also exercised her right to present witnesses on her behalf and to testify.   She had the assistance of counsel.   Despite her claim to the contrary, the record shows that Berry was given all the process that was due.   The fact that she disagrees with the decision reached

-18-

by the trial court does not mean that she was denied due process. As there is no evidence in the record that any of Berry's fundamental rights under the law were violated, her third assignment of error is overruled.

{¶20} Having found no prejudicial error in the particulars assigned and argued, the judgment of the Court of Common Pleas of Shelby County, Juvenile Division, is affirmed.

*Judgment Affirmed*

**SHAW and PRESTON, J.J., concur.**

**/hls**