[Cite as *In re A.M.*, 2026-Ohio-2368.]

# IN THE COURT OF APPEALS OF OHIO
# THIRD APPELLATE DISTRICT
# HANCOCK COUNTY

IN RE:

    A.M.,

**ADJUDICATED DEPENDENT CHILD.**

**[AARON W. - APPELLANT]**

CASE NO. 5-25-33

**OPINION AND JUDGMENT ENTRY**

Appeal from Hancock County Common Pleas Court
Juvenile Division
Trial Court No. 2023 AND 0038

**Judgment Affirmed**

**Date of Decision:  June 22, 2026**

APPEARANCES:

    *Linda Gabriele* **for Appellant**

    *Miranda M. Lobdell* **for Appellee**

**Willamowski, J.**

{¶1} Father-appellant Aaron W. ("Father") brings this appeal from the judgment of the Court of Common Pleas of Hancock County, Juvenile Division, terminating his parental rights and granting agency-appellee Hancock County Department of Job and Family Services' ("the Agency") motion for permanent custody of A.M. Father claims on appeal that the trial court's decision was against the manifest weight of the evidence, that it was not in A.M.'s best interest, that the Agency failed to use reasonable efforts to facilitate a relative placement, and that Father was denied the effective assistance of counsel. For the reasons set forth below, the judgment is affirmed.

{¶2} In September 2023, A.M. was born to April C. ("Mother") and Father. Upon the child's birth, the Agency filed a complaint requesting temporary custody of A.M. alleging that A.M. was a dependent child due to Mother's inability to provide a safe and stable environment to her prior seven children and was living with unsafe people at the time of A.M.'s birth. The trial court granted the ex parte motion and granted temporary custody to the Agency the day after the child's birth. At that time, a different man was the alleged father of A.M. The trial court then appointed a guardian ad litem ("GAL") for A.M. soon after.

{¶3} Prior to the adjudication on the complaint, the GAL filed a report and recommendation. The GAL had spoken with the foster family and the caseworker, but had not spoken with Mother or Father. The GAL noted that A.M. was a healthy

newborn with no drugs in his system. The GAL recommended that A.M. remain with the foster family while Mother worked the case plan. On November 17, 2023, the trial court adjudicated A.M. to be a dependent child due to Mother's failure to fully control her angry and abusive behavior and her lack of safe and stable housing. The trial court then ordered that the Agency be awarded temporary custody as the disposition.

{¶4} On November 30, 2023, it was determined that the alleged father was not the biological father of A.M. At that point, Father was tested and determined to be the biological father of A.M. On January 22, 2024, Father's paternity was established by the trial court and he was added as a party. Due to an inability to locate Father, service via publication was completed on February 17, 2024.

{¶5} On March 6, 2024, the GAL filed a second report with recommendations. For the report, the GAL interviewed the foster family, the caseworker, and Mother. The GAL noted that she had not been able to contact Father as there was no information regarding his whereabouts. The GAL concluded that Mother was unable to properly care for A.M. at that time and recommended that temporary custody with the Agency be continued.

{¶6} The trial court conducted a review hearing on March 8, 2024. Following the hearing, the trial court determined that the Agency had made reasonable efforts to avoid continued removal of A.M. The Agency's temporary custody of A.M. was continued. An amended case plan was then filed by the

Agency on March 13, 2024. The amended case plan added services for Father, noting that Father had no relationship with A.M. and that the Agency had not successfully contacted Father. The case plan required Father to cooperate with the Agency on future case plans. The case plan also required Father to begin visiting with A.M. to establish a relationship. The Agency then sent a referral to Harmony House to allow Father to visit with A.M.

{¶7} On July 18, 2024, the GAL filed a third report. In making the report, the GAL contacted the foster family, the previous caseworker, the current caseworker, staff at Harmony House, and Mother. The GAL also reviewed the reports from the Agency and Harmony House. The GAL noted that Father had been consistently visiting with A.M. and "expressed a strong desire to do better for his child." July 18, 2024 GAL Report at 4. The GAL also noted that Father had maintained a stable residence since beginning the case plan. The GAL expressed concern with Father missing court hearings and not being able to properly transport A.M. due to a suspended driver's license. The GAL also was concerned that Father and Mother would not continue A.M.'s occupational therapy services if custody were returned to one of them. The GAL then recommended that the Agency continue with temporary custody.

{¶8} On August 27, 2024, the Agency filed its semi-annual review. The Agency expressed concerns with Father having bench warrants due to failing to pay court costs that resulted in a suspended license. The Agency also was concerned

with Father's use of marijuana and ordered him to have a substance use and mental health assessment. With both of these issues, the Agency noted there had been some progress, specifically noting the counselor found no substance use issues and that Father had become "more engaged" in services since June. The Agency noted that Father had completed his parent education class with positive reports. However when the caseworker made some suggestions, Father became defensive. The Agency noted that Father had made some progress and was working on building a relationship with A.M. The Agency recommended that services continue. Following a hearing on the Agency's review, the trial court granted a six month extension and maintained temporary custody with the Agency.

{¶9} On October 31, 2024, the GAL filed a fourth report. In making this report, the GAL spoke with the foster family, all of the caseworkers, the CASA, the staff at Harmony House, Mother, and Father. The GAL noted that Father was consistently visiting with A.M. The GAL still had concerns about Father appearing for court when ordered and being able to transport A.M. to medical appointments. After visiting Father's home, the GAL was concerned that he smoked in the home, which could cause issues since A.M. had been diagnosed with asthma. The GAL was concerned that the home had hazards that would need to be "fenced off", that the home needed baby proofing, and that Father did not fully understand the health needs of A.M. As a result, the GAL recommended that temporary custody of A.M. remain with the Agency.

{¶10} On January 7, 2025, the Agency filed a motion for permanent custody of A.M. The motion was based upon the fact that A.M. had been in the temporary custody of the Agency for at least twelve months in a consecutive twenty-two month period and the child could not be placed with either parent within a reasonable time. The Agency claimed that it would be in A.M.'s best interest for the motion for permanent custody to be granted. On February 11, 2025, Father moved for an increase in his parenting time.

{¶11} On February 20, 2025, the GAL filed a fifth report. The GAL noted that the prior concerns still existed and that Father was no longer consistently visiting with A.M. The GAL noted that Father's visitations were suspended for 30 days due to his missing too many visits. The GAL recommended that A.M. remain in the foster family. A follow up report was filed on July 29, 2025. The GAL again recommended that the Agency's motion for permanent custody be granted.

{¶12} A hearing on the motion for permanent custody was held on August 4 and 5, 2025. Father was not present for the first day of the hearing. At the hearing the Agency presented the testimony of multiple witnesses.[1] The first was Kelli Miller ("Miller"). Miller testified that she was the Agency's administrator. She has supervised Mother's cases since she first became involved with the Agency. A.M. entered the temporary custody of the Agency one day after his birth in September

---

[1] As the only appellant in this case is Father, we will restrict a review of the testimony to that which concerns A.M. and Father.

2023. The Agency then filed its motion for permanent custody on January 7, 2025. The adjudication of A.M. as a dependent child occurred on November 21, 2023. Disposition occurred immediately afterwards. According to Miller, A.M. has remained in the temporary custody of the Agency since his removal from the home. In the original case plan, Father was not provided services as paternity had not been established. Father was identified as the biological father on the case plan on January 30, 2024, however no services were listed as they had not been in contact with him. Services were first identified for Father in the March 13, 2024 case plan. The Agency required Father to 1) cooperate with the Agency and 2) engage in visitation. In April 2024, the Agency added additional services for Father: 1) parent education, 2) resolution of all legal issues, 3) safe and stable housing, and 4) mental health and substance abuse assessments.

{¶13} When asked about whether Father had obtained safe and stable housing, Miller said there were concerns. Over the life of the case, contact with Father became more difficult. Although Father still has an apartment in Findlay, he spends most of his time with his girlfriend in Fostoria. Father has not given the Agency information regarding the girlfriend and the Agency has not been permitted to visit that home. According to Miller, Father "reports that him and the girlfriend have a new baby and he doesn't' want us at the home because he doesn't want us involved with that child." Tr. 45. Father insists that his meeting with the Agency

be in public places. The inability to evaluate Father's home and the people in it raised concerns with the Agency.

**{¶14}** Father was also required to complete parent education. The Agency required Father to attend the class because he had no prior relationship with A.M. Additionally, Father had previously had voluntarily surrendered his parental rights with a prior child in 2021. Father passed the class he attended and then requested additional services, so he was given a referral for a wellness coach. Father failed to follow through with those services despite requesting them himself. From observations in visitation, Miller did not believe that Father was "doing appropriate parenting." Tr. 50.

**{¶15}** Father was expected to attend supervised visitation with A.M. The Agency imposed this due to Father having no prior relationship with A.M. Father began visiting with A.M. in April of 2024 at Harmony House. The visits were weekly for one hour when they started. Father did not progress to more visitation time due to his missing too many visits. In November 2024, he was placed on a 30 day suspension for missing too many visits. He could have called to reinstate visits in late December, but did not do so until January 2025. After agreeing to days and times for visits, Father did not return calls from Harmony House to get the visits scheduled. Father refused the location and insisted they not be at Harmony House any more. According to Miller, Father had not visited with A.M. for approximately

nine months. When the Agency asked Father why he was not visiting, he replied that he just didn't care.

{¶16} The Agency added drug and mental health assessments for Father due to his prior convictions for drug charges and his expressed concerns with anxiety. Father told the Agency that he had gone to OhioGuidestone and that no services were recommended. When the Agency reached out to OhioGuidestone, the Agency learned that Father had cancelled three appointments and never returned. The last contact OhioGuidestone had with Father occurred in October 2024. This concerned Miller because Father was misleading them and not addressing the issues. Additionally, Miller asked Father to submit a drug screen in February 2025, and Father refused. Father indicated that "he was tired of the Agency poking and prodding in his life" and that he would consider screening if he was getting more time with A.M. Tr. 57. The refusal to submit to a screen is considered an "all positive" and would result in suspension of visits until three clean screens occurred.

{¶17} Father was also required to resolve his legal issues. Harmony House does not allow those with active warrants to visit and Father had an active warrant for failure to appear in August 2024. Miller indicated that Father had completed this part of the case plan.

{¶18} According to Miller, one area that Father failed to make progress was with communication. Father would go months without the Agency being able to

contact him. As of the time of the hearing, the Agency continued to struggle with communication as Father refuses to work with them.

{¶19} Miller testified that Father had failed to remedy the conditions causing the removal of A.M. Father has failed to engage and failed to complete the necessary services. Miller testified that she had recently spoken with Father and reminded him of the court date, yet Father did not appear for the hearing. Miller testified that she did not believe that Father could provide an adequate, permanent home for A.M. due to his failure to maintain a bond with A.M. After failing to visit with A.M. for nine months, Miller indicated that A.M. "doesn't even know who [Father] is." Tr. 71. According to Miller, A.M. has no relationship with Father.

{¶20} Miller testified that A.M. went to the foster home directly from the hospital after his birth. A.M. is bonded with his foster family and one of his biological siblings (from his mother) has previously been adopted by the foster family. Miller testified that A.M. needs a legally secure and permanent placement which cannot be accomplished without terminating the parental rights of Mother and Father. Additionally, A.M. has been in the Agency's custody for the last 12 out of 22 months. The chance of A.M. being adopted by his current foster family is 100 percent.

{¶21} On cross-examination, Miller testified that Father has multiple sclerosis and is blind in his right eye. Father does not drive so the Agency offered

transportation services. Father did not utilize the services offered, instead riding his bike or relying on his girlfriend to transport him.

{¶22} Carrie Y. ("Carrie") testified that she has been the foster parent of A.M since September of 2023. Carrie took A.M. to his weekly visits at Harmony House. Visits began with Mother in November 2023. The visits with Father started in May 2024. When A.M. returned from visits with Father over lunch time, A.M. would return without most of the food uneaten. The caseworker told Carrie that Father struggled to get A.M. to eat. A.M. had issues with food textures, so was difficult to feed. As a result, he received feeding therapy and occupational therapy. A.M. was unhappy when they arrived for visits and was tired and cranky after visits. Once home from the visits, A.M. would be clingy to Carrie or her husband.

{¶23} The hearing continued on August 5, 2025, and Father was present for this day. Alicia Dean ("Dean") testified to being the case manager at Harmony House. According to Dean, when Father visited the visits went well, but the visits were suspended due to inconsistent visits. Dean offered Father multiple different days and times to attempt to accommodate his visiting with A.M. They were not able to work out a schedule because everything requested by Father was outside their hours.

{¶24} On cross-examination Dean testified that it was not uncommon for children to be upset when entering visits. A.M. calmed down quickly and the visits went well. Father would generally get on the floor and play with A.M. and toys.

Dean also testified that A.M. did fall back and hit his head during a visit with Father, but the observer did not have to intervene as the visit was not deemed unsafe. When A.M. fell, Father picked him up, made sure A.M. was not hurt and then set him between Father's legs so he would not fall again.

{¶25} The GAL testified that A.M. is a "thriving, happy, healthy child" in the care of his foster parents. Tr. 177. His development is progressing and he is reaching his milestones. The GAL's initial experience with Father was positive, however, the initial home visit did not present a safe environment for visitation. There were exposed wires, a hole in the floor to access plumbing, empty alcohol bottles, and objects that could easily be pulled over by a toddler. At that time, the GAL and the case worker provided Father with a list of things to fix for visits to be allowed in the home. The GAL has attempted to complete a follow up visit, but Father stopped communicating with her. Thus, the GAL has no knowledge as to whether the conditions have changed.

{¶26} The GAL also testified that A.M. has food issues that require therapy. Additionally, he has issues with asthma and eczema. The numerous medical and therapy appointments, some of which were in Toledo or Columbus, caused concern about transportation issues for Father and Mother. The GAL's opinion was that A.M.'s best interest would be served by him remaining with the foster parents. The GAL indicated that Father had not shown a safe and stable home, lacks the ability to transport A.M. to medical appointments, and has no bond with A.M.

{¶27} On cross-examination, the GAL admitted that she had not attempted to contact Father since November of 2024. Her reason for this was she did not believe Father cared about A.M. The GAL admitted that she had not attended any of the visits between A.M. and Father. The GAL admitted that she had not attempted to personally contact Father, instead relying on what other people told her. The GAL also admitted that the case worker had visited Father's home on more than the one occasion, but the GAL was unable to attend those visits due to work commitments.

{¶28} Father then testified on his own behalf. Father testified that his visits were suspended because he missed a couple of visits. The visits were missed due to lack of transportation and it took him too long to walk there. Due to his issues with vision, it is difficult for him to ride his bike or walk, especially at night. Father admitted that the case worker offered him transportation through the Hancock Area Transportation Services ("HATS"). The case worker told him she could help him get assistance, but did not follow up with him. Father claimed that Harmony House never got back to him to set up the visits after they agreed to Tuesdays at 2:00 p.m. After no one from Harmony House got back to Father, he filed a motion to have the visits at the location where he took his parenting class. Father said that his parenting class went well and he learned some things. Father testified that he completed his parenting class as well as counseling at OhioGuidestone. Since he was diagnosed with MS, Father has cut back on using alcohol and tobacco. Father denies using

any illegal substances anymore. Father testified that he felt like he was wasting his time trying to work with the Agency because they frequently ignored him. According to Father, he has had his landlord repair the issues with his apartment and has complied with the Agency's requests. Father testified that the GAL never contacted him after the one visit.

{¶29} As to his relationship with A.M., Father testified that they did have a bond. When A.M. was fussing upon arrival at the visits, Father was able to calm him. Father testified that he would have liked to attend medical appointments with A.M., but no one provided him the times. The Agency told him that it was up to the foster parents to share that information if they wished to do so. Father indicated that he felt like he was not getting a "fair shake" because he joined the case late and the Agency had already set goals and decided how the case would progress.

{¶30} On cross-examination Father admitted that he was unemployed and that his form of transportation is his bicycle. Father also admitted that his vision impairs his ability to be out at night. When asked why he did not utilize HATS, Father said that he "didn't care to go through all of that for transportation." Tr. 252. His last visit with A.M. was on November 27, 2024. Tr. 253. When asked how he would transport A.M. to medical appointments, Father indicated he could arrange it through his insurance. Father testified that he would be able to provide A.M. with his maintenance treatments for his asthma and eczema. Father admitted that he had

not provided the Agency with the name of his girlfriend since they do not live together.

{¶31} At the conclusion of the hearing, the trial court took the matter under advisement. On October 15, 2025, the trial court entered a judgment granting the Agency's motion for permanent custody of A.M. Father appealed from this judgment. On appeal he raised the following assignments of error.

### First Assignment of Error

**The juvenile court's decision is against the manifest weight of the evidence as the Agency did not prove by clear and convincing evidence that it should be granted permanent custody of the minor child.**

### Second Assignment of Error

**The juvenile court abused its discretion in finding that permanent custody to the Agency was in the minor child's best interest.**

### Third Assignment of Error

**The juvenile court erred in finding that the Agency made reasonable efforts to facilitate a relative placement for the child.**

### Fourth Assignment of Error

**The juvenile court erred and abused its discretion denying [Father's] right to due process and effective assistance of counsel.**

*Manifest Weight and Best Interest*

{¶32} In the first assignment of error, Father claims that the trial court's decision to grant the Agency's motion for permanent custody was against the manifest weight of the evidence. Father claims in the second assignment of error

-15-

that the judgment was not in the child's best interest.  As these two assignments of error are intertwined, we will address them together.  The right to parent one's own child is a basic and essential civil right.  *In re Murray*, 52 Ohio St.3d 155 (1990). "Parents have a 'fundamental liberty interest' in the care, custody, and management of their children."  *In re Leveck*, 2003–Ohio–1269, ¶ 6 (3d Dist.). These rights may be terminated, however, under appropriate circumstances and when all due process safeguards have been followed.  *Id*.  When considering a motion to terminate parental rights, the trial court must comply with the statutory requirements set forth in R.C. 2151.414. These requirements include, in pertinent part, as follows:

> (B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
>
> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

. . .

**(d)** The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

. . .

For the purposes of division (B)( 1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to [R.C. 2151.28] or the date that is sixty days after the removal of the child from home.

. . .

(D)(1) In determining the best interest of a child at a hearing held pursuant to division (A) of this section . . . the court shall consider all relevant factors, including, but not limited to, the following.

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies . . . for twelve or more months of a consecutive twenty-two month period . . . .

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency.

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414. "A court's decision to terminate parental rights will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which a court can determine by clear and convincing evidence that the essential statutory elements for a termination of parental rights have been established." *In re Da.R.*, 2019-Ohio-2270, ¶ 9 (3d Dist.).

{¶33} The determination whether to grant a motion for permanent custody requires a two-step approach. *In re L.W.*, 2017-Ohio-4352 (3d Dist.). The first step is to determine whether any of the factors set forth in R.C. 2151.414(B)(1) apply. *Id.* If one of those circumstances applies, then the trial court must consider whether granting the motion is in the best interest of the child by considering the factors set forth in R.C. 2151.414(D). *Id.*

{¶34} In this case, A.M. entered the care of the Agency in early September 2023. The adjudication of dependency occurred on November 11, 2023. The Agency filed its motion for permanent custody on July 14, 2025. The testimony was that A.M. had been in the care of the Agency the entire time. This means that A.M. had been in the care of the Agency for approximately 20 months. Thus more

than 12 months had passed in the consecutive twenty-two month period preceding the filing of the motion. This satisfies the condition under R.C. 2151.414(B)(1)(d).

{¶35} Even if we did not consider the length of time that A.M. had been in the custody, the trial court found that A.M. could not be placed with either of his parents within a reasonable time. A review of the record shows that Father failed to comply with the case plan by failing to consistently visit with A.M. At the time of the filing of the motion for permanent custody in July 2025, Father had not visited with A.M. since December of 2024. This indicates a lack of commitment towards A.M. under R.C. 2151.414(E)(4). Additionally, the testimony was that Father lacked transportation to get A.M. to the various required medical appointments. Father was not in contact with the Agency as required by the case plan. Father also admitted that he had no source of income to care for A.M. R.C. 2151.414(E)(1). Once the trial court indicated that these factors were present, the trial court was required to enter a finding that the child could not be place with Father within a reasonable time. R.C. 2151.414(E).

{¶36} Once the trial court has found one of the factors under R.C. 2151.414(B) are present, it must then consider the best interest of the child using the factors set forth in R.C. 2151.414(D). A review of the record shows that A.M. was very bonded with his foster family and his biological sibling in the foster home. While the visits with Father went well, the testimony showed that A.M. was not disturbed by not seeing Father and was doing well when the visits did not occur.

This indicates that there was no strong bond between Father and A.M. R.C. 2151.414(D)(1)(a).

{¶37} A.M. was not yet two years old at the time of the hearing, so was unable to express an opinion. The GAL recommended that the motion for permanent custody be granted. R.C. 2151.414(D)(1)(b).

{¶38} The custodial history of A.M. was that he had been in the temporary custody of the Agency since the day after his birth. Since then, A.M. was in one foster home for the nearly two years of his life. His biological sibling had previously been adopted by that family and the foster mother indicated that if A.M. were to be available for adoption, she and her husband definitely would apply to adopt him. They were the only caregivers known by A.M. R.C. 2151.414(D)(1)(c).

{¶39} The GAL and Miller both testified that A.M. needed a permanent placement. They also testified that the only way this could occur is if permanent custody of A.M. were granted to the Agency. R.C. 2151.414(D)(1)(d).

{¶40} Given all of the factors to be weighed when considering the best interest of the child, the record shows that they weigh heavily in favor of granting the motion. Father raised some issues with how the case plan was implemented, but waited until the permanent custody hearing to do so. Additionally, Father had not visited with A.M. in several months. Although Father wished for more time because he wanted a relationship with A.M., the effect of the decision on the parent is not a factor to be considered by the trial court. R.C. 2151.414(C). Since at least one of

the factors in R.C. 2151.414(B)(1) were present and the granting of the motion was in the best interest of A.M., the trial court's decision is not against the manifest weight of the evidence. The first and second assignments of error are overruled.

*Relative Placement*

{¶41} Father claims in the third assignment of error that the trial court erred by finding that the Agency made reasonable efforts to place A.M. with a relative. Initially, this Court notes that there is no statutory requirement for an Agency to make reasonable efforts to effect a relative placement prior to seeking permanent custody. *In re Schaefer*, 2006-Ohio-5513, ¶ 64. "The [Agency] is under no statutory duty to make reasonable efforts to place a child with relatives although relative placement is to be investigated." *In re Warren*, 2007-Ohio-5703, ¶ 23 (5th Dist.). Although an Agency "should strive to place a child with a willing and suitable relative, we will not impose a duty on the agency to search for and examine every possible relative, especially those that have never indicated a desire to be considered as a placement option." *In re Brown*, 2004-Ohio-3337, ¶ 14 (11th Dist.) and R.C. 2151.412(G). An Agency is only required to investigate relatives that have been identified, are suitable, and are willing to take custody of the child. *See In re M.O.*, 2011-Ohio-2011 (4th Dist.); *Brown, supra*; *In re K.M.D.*, 2012-Ohio-755 (4th Dist.).

{¶42} Although Father claims on appeal that the Agency should have attempted to place A.M. with one of his relatives, a review of the record does not

indicate that Father ever provided any suggestions for the Agency. During his testimony, Father mentioned that he had relatives and was an uncle. However, he also testified that he was doing everything without any family support and did not suggest any family members for consideration. Even in his brief, no relatives who should have been investigated are provided. Since Father did not identify any relatives and none came forward to indicate a willingness to take A.M., the Agency had no legal duty to investigate a relative placement before seeking permanent custody. The third assignment of error is overruled.

*Effective Assistance of Counsel*

{¶43} Father's fourth assignment of error raises the issue of the effectiveness of counsel and the trial court's denial of his request for new counsel in the middle of the hearing. During the hearing, Father became upset with his counsel and told the trial court that he wished to have new counsel.

The Court: [Father], do we need to take a break?

[Father]: I don't want this man to represent me no more. He's falling asleep. He doesn't care. He talks to me, he treat me like a (inaudible).

The Court: Do you need to take a break to talk to Mr. Elliott?

[Father]: Yeah, I do. I don't want him representing me no more.

The Court: Well, we're in the middle of the, the trial. We are not going to change Counsel.

[Father]: I'm cool. It's him. He's the issue.

The Court: All right.

[Father]: I don't want him representing me. That's just –

The Court: If you need some time to talk to your attorney, we'll take a short recess and give you the opportunity to do that. Otherwise, your conversation back there is –

[Father]: Yeah, I want to talk to him. I need to speak with him.

The Court: Are you listening to me, [Father]?

[Father]: Yeah.

The Court: Please refrain from talking during testimony of other parties.

[Father]: Judge, I'm trying to –

The Court: Yeah, I'm, I'm asking if you need some time to talk to Mr. Elliott –

[Father]: Yeah.

The Court: We'll, we'll take a, a ten-minute break here.

Tr. 194-195. After the brief recess, the trial court indicated that it was treating Father's statements as an oral motion for replacement counsel and denied the motion. The trial court noted that they were in the middle of the trial, that Father had failed to attend the first day of the trial, but counsel did attend. The trial court also noted that counsel had asked appropriate questions during the trial. Father did not raise any further objections to counsel and counsel continued to cross-examine witnesses, present the testimony of Father, and made appropriate arguments. Viewing the record as a whole, the trial court gave due consideration to Father's

request, but ruled against him. The record does not indicate that the trial court abused its discretion in denying Father's request for new counsel.

**{¶44}** To establish an ineffective assistance of counsel claim, a defendant must demonstrate (1) that counsel's performance fell below an objective standard of reasonable representation and (2) that he was prejudiced by that performance. *Strickland v. Washington*, 466 U.S. 668 at 687-688 (1984). Prejudice is established when the defendant demonstrates "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. The failure to prove either 1) a substantial violation or 2) prejudice caused by the violation makes it unnecessary for a court to consider the other prong of the test." *State v. Walker*, 2016-Ohio-3499, ¶ 20 (3d Dist.).

**{¶45}** Here, Father's only real complaints were that he believed counsel was falling asleep and that he did not like how counsel spoke to him. A review of the record does not support that counsel was falling asleep. On both days of the trial, counsel was immediately responsive to all questions asked of him by the court, promptly began cross-examinations and asked relevant, probative questions in support of Father's position. On the second day, counsel presented the testimony of Father in support of Father's position. Counsel also successfully argued in favor of Father retaining visitation rights while awaiting the trial court's decision and

-24-

during any appeal time. Given the evidence before this court, we do not find that counsel substantially violated any of his duties or that his performance fell below the objective standard of reasonable representation. The fourth assignment of error is overruled.

{¶46} Having found no errors prejudicial to the appellant in the particulars assigned and argued, the judgment of the Court of Common Pleas of Hancock County, Juvenile Division, is affirmed.

*Judgment Affirmed*

**ZIMMERMAN, P.J. and WALDICK, J., concur.**

# **JUDGMENT ENTRY**

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered.  The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket.  See App.R. 30.

John R. Willamowski, Judge

William R. Zimmerman, Judge

Juergen A. Waldick, Judge

DATED:
/hls